UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Case No.: 15-16388-JKO |
| HIGH RIDGE MANAGEMENT CORP., *et al.*,[1] | Chapter 11 (Jointly Administered) |
| Debtors. _____/ | |

**DEBTORS' EMERGENCY MOTION FOR TURNOVER OF THE ESTATE, OR IN THE ALTERNATIVE, FOR ENTRY OF AN ORDER DIRECTING THE RECEIVER TO PROVIDE (1) AN ACCOUNTING, (2) INFORMATION REQUIRED BY THE DEBTORS TO COMPLY WITH THEIR OBLIGATIONS AND DUTIES AS DEBTORS-IN-POSSESSION, AND (3) INFORMATION REQUIRED BY THE DEBTORS TO FACILITATE A SALE OF THEIR ASSETS**

**\*EMERGENCY HEARING REQUESTED\***
**THE DEBTORS REQUEST A HEARING BE SCHEDULED AS SOON AS POSSIBLE SO THAT THE DEBTORS CAN COMPLY WITH THEIR DUTIES AS DEBTORS-IN-POSSESSION, INCLUDING THE FILING OF SCHEDULES AND STATEMENTS, WHICH ARE DUE WITHIN 14 DAYS OF THE PETITION DATE. IN ADDITION, THE DEBTORS ARE SEEKING AUTHORITY TO SELL SUBSTANTIALLY ALL OF THEIR ASSETS AND ARE REQUIRED TO PROVIDE ACCESS TO THE NURSING HOME FACILITY AS WELL AS INFORMATION TO THE PROPOSED BUYER ON A TIMELY BASIS. WITHOUT THE RELIEF REQUESTED, THE DEBTORS WILL BE UNABLE TO COMPLY WITH THEIR REQUIREMENTS UNDER THE BANKRUPTCY CODE OR THEIR OBLIGATIONS UNDER THE SALE AGREEMENTS WITH THE BUYER.**

High Ridge Management Corp., Hollywood Pavilion, LLC, and Hollywood Hills Rehabilitation Center, LLC (collectively, the "Debtors"), pursuant to 11 U.S.C. § 543, request entry of an order directing turnover of property of the Debtors' estates, or in the alternative, directing the Replacement Receiver (defined hereinbelow) to provide (1) an accounting, (2) records, information and cooperation necessary for the Debtors to comply with their obligations

---

[1] The following cases are jointly administered pursuant to this Court's *Order Jointly Administering Chapter 11 Cases* [ECF No. 10], *In re High Ridge Management, Corp.*, Case No. 15-16388-JKO, *In re Hollywood Hills Rehabilitation Center, LLC,* Case No. 15-16389-JKO, and *In re Hollywood Pavilion, LLC*, Case No. 15-16390-JKO.

1

and duties under the Bankruptcy Code as well as the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Chapter 11 Trustees* (the "UST Guidelines"), as well as (3) access, information and cooperation required by the Debtors to facilitate a sale of substantially all of their assets. In support of this motion (the "Motion"), the Debtors state:

## BACKGROUND

*Description of Debtors*

High Ridge Management Corp. ("High Ridge"), Hollywood Hills Rehabilitation Center, LLC ("Hollywood Hills"), and Hollywood Pavilion, LLC ("Pavilion"), are affiliated entities. High Ridge is the one-hundred percent (100%) owner of the membership interests in Pavilion and Hollywood Hills. High Ridge owns real property located at 1200 North 35th Avenue and 1201 North 37th Avenue, Hollywood Florida (the "Real Property"), and is the landlord of Pavilion and Hollywood Hills. Before executing a management agreement with Larkin (defined and discussed below), Pavilion operated a fifty (50) bed Florida-licensed mental health hospital on the Real Property. Before the appointment of a receiver, Hollywood Hills operated a one hundred fifty-two (152) bed Florida-licensed nursing home on the Real Property.

*Loan Documents*

On October 16, 1996, High Ridge, Herbert Kallen, and Leonore Kallen executed a loan agreement and promissory note with BankAtlantic in the amount of $7,000,000.00 (the "First Note"). In conjunction with the First Note, High Ridge executed a mortgage and security agreement as well as an assignment of rents, leases, and deposits in favor of BankAtlantic (collectively, the "Security Instruments"). On October 24, 1996, BankAtlantic recorded the Security Instruments and filed a UCC financing statement with the State of Florida. After execution of the First Note, the loan was modified and consolidated various times, resulting in

seven different promissory notes and various mortgage modifications, plus additional guarantees, including those of Hollywood Hills and Pavilion (collectively, the "Loan Documents"). Branch Banking & Trust Company ("BB&T") was the successor-by-merger to BankAtlantic. Thereafter, in 2013, the Loan Documents were assigned to Stabilis Fund II, LLC ("Stabilis"), who then assigned the Loan Documents to Hollywood Property Investments, LLC ("HPI") in 2014.

### *Pavilion[2] Loses Medicare Privileges*

On October 2, 2012, the federal government indicted Karen Kallen-Zury, the Debtors' former CEO, in the case *United States v. Karen Kallen-Zury,* Case No. 12-20757-CIV-Martinez, in the United States District Court for the Southern District of Florida and alleged Medicare fraud. Ms. Zury was convicted, and on September 11, 2013, the District Court entered a Judgment of Conviction and Sentence against Ms. Zury in the amount of $39,355,328.00. The referenced judgment is currently on appeal to the Eleventh Circuit Court of Appeals. In connection with the referenced district court proceeding, the U.S. government froze funds in Hollywood Hills' operating account in the approximate amount of $500,000, and Pavilion's operating account in the amount of $50,000. As of the Petition Date, these funds remain frozen.

On May 3, 2013, the Centers for Medicare and Medicaid Services ("CMS") issued a letter informing Pavilion that its Medicare privileges were being revoked based upon Pavilion's failure to respond to a written communication from CMS. The written communication was sent to an address where Pavilion used to operate an outpatient facility, but was not a current address at the time the communication was sent by CMS. Thereafter, on September 12, 2013, Pavilion's Medicare billing privileges and its participation in the Medicare program was revoked. The revocation of Pavilion's Medicare privileges was not based upon any issues regarding patient

---

[2] To the best of the Debtors' knowledge, Hollywood Hills has not lost any Medicare privileges.

care, and was based upon the lack of response to a letter that was not timely received by Pavilion.

### *State Court Action and Appointment of Receiver*

On December 5, 2013, Stabilis commenced a foreclosure proceeding against the Debtors in the Circuit Court, in and for the 17th Judicial Circuit, Case No. 13-026516 (12) (the "State Court Action"). The State Court Action is a complex foreclosure proceeding, not only because of the nature of the Debtors' businesses, but also because of the defenses and claims raised by the Debtors.

The Debtors contested (and still contest) the existence of a default under the Loan Documents and raised various affirmative defenses, as well as counterclaims. On December 11, 2013, Stabilis moved to appoint a receiver. On January 16, 2014, the state court entered an order appointing Clyde Hamstreet as receiver over the Real Property, and granted him power to manage and control the operations of Pavilion and Hollywood Hills. Pavilion and Hollywood Hills filed a counterclaim against asserting breach of contract and wrongful appointment of a receiver because their assets were not included as part of the collateral securing the debt. On or about April 29, 2014, the state court appointed Jon H. Steinmeyer as substitute receiver (the "Replacement Receiver").

### *Larkin's Signs Agreement to Purchase Pavilion, But Instead Acquires Loan Documents and Replaces Receiver*

In January 2014, approximately one month after the commencement of the State Court Action, Pavilion executed a purchase agreement (the "Larkin APA") for the sale of Pavilion's assets[3] to Larkin Community Hospital, Inc. ("Larkin"). The Larkin APA provided for a purchase price of $1,060,000 to be paid by Larkin to Pavilion. Larkin provided a deposit of $60,000 at the

---

[3] The assets subject of the Larkin APA include the hospital license and personalty related to the hospital operations.

4

time of execution of the Larkin APA. In addition, in order to facilitate the sale, Pavilion and Larkin entered into an interim management agreement for Larkin to operate the hospital. Larkin was also supposed to enter into a lease of the real property with High Ridge, contingent upon the closing of the sale with Pavilion.

However, in April 2014 approximately three months after the appointment of Mr. Hamstreet as receiver, HPI, an entity owned and controlled by Larkin, purchased and was assigned the Loan Documents. What started out as a purchase of Pavilion's assets turned into Larkin's attempt at a loan-to-own takeover of all of the Debtors' assets.

On February 14, 2014, during the pendency of the Larkin APA, the Agency for Health Care Administration ("AHCA") filed two complaints, one against Pavilion and another against Hollywood Hills,[4] to revoke their respective hospital and nursing home licenses.[5] Around this time, and as part of the contemplated sale to Larkin, Larkin submitted a request for change of ownership of Pavilion's hospital license to Larkin. On or about June 19, 2014, AHCA issued a notice of intent to deny that application. However, thereafter, on or about October 10, 2014, AHCA entered a final order approving a settlement agreement between AHCA, Pavilion and Larkin, whereby AHCA agreed to withdraw its complaint against Pavilion to allow the processing of Larkin's change of ownership application.[6] Therefore, Larkin continues to manage Pavilion's business, pending approval of the change of ownership from Pavilion to Larkin. However, the $60,000 was turned over to a successor closing agent at Larkin's direction. Upon information and belief, the Replacement Receiver has the authority to close on the transaction

---

[4] Upon information and belief, the AHCA complaint against Hollywood Hills was dismissed.

[5] *State of Florida, Agency for Health Care Administration v. Hollywood Hills Rehabilitation Center, LLC,* AHCA No. 2014-000953*; and State of Florida, Agency for Health Care Administration v. Hollywood Pavilion, LLC,* AHCA No. 2014-001019.

[6] *Larkin Community Hospital, Inc. d/b/a Larkin Community Hospital v. State of Florida, Agency for Health Care Administration*, AHCA No. 2014006070.

with Larkin on the same terms that had been negotiated with Pavilion, which is pending approvals from AHCA and the U.S. Dept. of Justice.

Almost immediately after the assignment of the Loan Documents to HPI, HPI filed a motion to replace Mr. Hamstreet with the Replacement Receiver. Upon information and belief, since the appointment of the Replacement Receiver, Larkin has incurred costs to comply with AHCA requirements in connection with its acquisition of the Pavilion hospital license and is attempting to include such costs as part of the debt allegedly owed by the Debtors to HPI. HPI asserts that the debt is approximately $14,000,000,[7] an amount that is approximately ***double*** the amount pled at the outset of the foreclosure by Stabilis. The Debtors dispute the extent of the debt, as well as the extent of the lien asserted by Stabilis, and now asserted by HPI.

### *Third Party Offer to Purchase Debtors' Assets*

During the pendency of the State Court Action, the Debtors received an arms' length, good-faith offer from a third-party to purchase substantially all of their assets for a price that exceeds the disputed debt amount asserted by HPI. The buyer's attempts to conduct routine diligence have been continually hindered or delayed by the Replacement Receiver. Specifically, the Debtors' and the third-party buyer had considerable difficulty in obtaining the necessary due diligence from the Replacement Receiver and his counsel. The buyer even sought to intervene in the case in order to be able to pursue due diligence. Additionally, after initially agreeing to allow a Phase II environmental assessment to be performed on site, the Replacement Receiver refused, at the last minute, to allow the inspection. The only party benefitting from these delays is HPI/Larkin because the longer the sale is delayed, the more accrued interest HPI/Larkin claims is

---

[7] HPI asserts that as of March 5, 2015, part of the debt owed to it under the Loan Documents includes $4,116,151 in "protective advances."

due, thus eroding the equity in the Real Property available for the estate[8] Moreover, by delaying the sale, HPI/Larkin is increasing its chances of foreclosing upon the Real Property and acquiring the nursing home business through such foreclosure. Accordingly, the Debtors filed for relief under Chapter 11 to facilitate the sale of their assets to 1200 North 35th Avenue, LLC and Hollywood Hills Operator, LLC (collectively, the "Buyer") for $17,000,000, a purchase price that exceeds the Debtors' aggregate debt.

### *The Bankruptcy Filing and Relief Requested*

The Debtors filed voluntary petitions under Chapter 11 on April 8, 2015 (the "Petition Date"). On the Petition Date, the Debtors filed motions seeking joint administration of their cases. In addition, the Debtors will be filing a motion to sell substantially all of the assets of High Ridge and Hollywood Hills (the "Sale Motion"), as well as their Joint Plan of Liquidation (the "Plan").

In order to successfully proceed through Chapter 11, the Debtors need to comply with administrative and procedural rules, as well as consummate the transactions subject of the Sale Motion and Plan. Accordingly, the Debtors respectfully request this Court enter an order, pursuant to 11 U.S.C. §§ 541 and 543, directing the Replacement Receiver to turnover the Debtors' property and assets, as this would best serve both creditors and the holders of equity interests. In the alternative, the Debtors request that the Court direct the Replacement Receiver to turnover all information, documents and otherwise cooperate and assist the Debtors comply with their requirements as debtors-in-possession under the Bankruptcy Code, all applicable rules, and UST Guidelines. Further, the Debtors request that the Court direct the Replacement Receiver to

---

[8] HPI asserts a per diem totaling $7,368.00, comprised of: (a) $1,945.00 simple interest; and (b) $5,423.00 differential default interest.

provide access, information and any other cooperation necessary to assist the Debtors to facilitate the sale of their assets.

## LEGAL BASIS FOR REQUESTED RELIEF

I. THE DEBTORS ARE ENTITLED TO TURNOVER OF THE ESTATE.

    A. <u>The Interests of Creditors and Equity Security Holders Would Best Be Served By Turnover of the Debtors' Estate.</u>

The Debtors seek to compel the Replacement Receiver to turnover property of the Debtors' estate and to provide an accounting regarding the transactions during the period while the Replacement Receiver was in possession and control of property of the estate. Property of the estate is broadly defined by 11 U.S.C. § 541 and includes "all legal or equitable interests of the debtor in property," "wherever located, and by whomever held." 11 U.S.C. § 541. Property of the estate also includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate." 11 U.S.C. § 541(a)(1), (6).

Soon after a petition is filed, the Bankruptcy Code mandates that a custodian[9] of the debtor's property to turn over to the debtor-in-possession any property of the debtor that is in its possession and to file an accounting. Specifically, the Bankruptcy Code requires the custodian to:

> (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and
>
> (2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time came into the possession, custody, or control of such custodian.

11 U.S.C. § 543(b).

---

[9] The Bankruptcy Code's definition of "custodian" includes a receiver. 11 U.S.C. § 101(11)(A).

There are only limited instances where, despite the mandate of the Bankruptcy Code requiring turnover of a debtor's property, the bankruptcy court will use its discretion to excuse a custodian's compliance with the turnover provision. The crux of this analysis focuses on "if the interests of creditors, and, if the debtor is not insolvent, of equity security holders would be better served" by permitting a custodian to remain in place. *In re Dill,* 163 B.R. 221, 225 (Bankr. E.D.N.Y. 1994); *see also* 11 U.S.C. § 543(d)(1). Importantly, the proponent of waiving compliance under § 543(b) and keeping estate property in the hands of a custodian bears the burden of establishing, by a preponderance of the evidence, that compliance should be waived. *In re Falconridge, LLC,* 2007 WL 3332769 *7 (Bankr. N.D. Ill. Nov. 8, 2007).

Several factors have been used in determining whether a court should exercise its discretion under § 543(d)(1), including: (1) the likelihood of reorganization, and whether funds held by the receiver are required for reorganization; (2) whether there are instances of mismanagement by the debtor; (3) whether turnover would be injurious to creditors; (4) whether the debtor will use the turned over property for the benefit of its creditors; (5) whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate. *Id; see also In re Dill,* 163 B.R. at 225.

Here, the factors weigh in favor of returning property of the estates back to the Debtors. Because the Debtors are not insolvent, the analysis focuses not only on the best interests of creditors, but on also on the best interests of equity holders. *See* 11 U.S.C. § 543(d)(1). Both creditors and holders of equity interests will be best served by turnover of the estate. First, there is a significant chance of reorganization. The Debtors are filing the Sale Motion and the Plan. The Sale Motion and the Plan contemplate a sale of substantially all of the assets of High Ridge

9

and Pavilion to the Buyer. Second, there were not instances of mismanagement by High Ridge or Hollywood Hills, nor any issues regarding patient care. Although a receiver was appointed after the former CEO was convicted of a crime relating to Pavilion, those acts should not be imputed on High Ridge and Hollywood Hills, or otherwise hinder their ability to reorganize. After the conviction and before the appointment the commencement of the State Court Action, the Debtors removed the former CEO, hired a new chief financial officer and took steps to preserve their assets. Further, turnover would not be injurious to creditors. Rather, it would benefit all parties as the Plan proposes a sale of the Debtors which will result in full payment to all allowed claims. Lastly, there may be litigation or avoidance claims which could be pursued for the benefit of the Debtors estates which could not be brought by the Replacement Receiver.

B.  <u>Turnover Will Not Disrupt the Debtors' Business, Nor Compromise Patient Care.</u>

The Debtors submit that turnover of property of the estate from the Replacement Receiver will not disrupt the Debtors' businesses, assets, nor compromise patient care.

First, with respect to Pavilion, the Debtors' are proposing to maintain the status quo, such that the interim management agreement with Larkin remain in place.

As to Hollywood Hills, the Debtors propose to leave all nursing home employees, as well as the back-office accountant currently providing services to Hollywood Hills in place. The only people who are proposed to be removed or replaced, are (a) the Replacement Receiver, (b) the chief financial officer employed by the Replacement Receiver, and (c) the full-time nursing home administrator. Instead, the Debtors propose to employ (i) Karen L. Goldsmith as the Debtors' chief compliance officer, (ii) Judith Selig as Hollywood Hills' full-time licensed

nursing home administrator,[10] and (iii) Soneet R. Kapila, CPA and KapilaMukamal LLP as the Debtors' accountants and financial advisors.

Ms. Goldsmith is an attorney that specializes in health care law and elder law and would assist the Debtors with risk management and corporate compliance. Ms. Goldsmith has frequently spoken and written on health care-related issues. Ms. Goldsmith has significant experience with respect to nursing home facilities. For example, in December 2012, Ms. Goldsmith became part of the team to bring new management and update the services and operation of St. Mark Village, an apartment, assisted living and nursing home complex. In that role, Ms. Goldsmith worked with the Board and chief executive officer in various areas of operations. Additionally, she developed the Employee Handbook, Corporate Compliance Program, modified the Resident Handbook, served as Corporate Compliance Officer and Educator, worked closely with insurance carrier counsel, and developed policies and procedures. Ms. Goldsmith has also handled transactions involving sales and leases, change of ownership of nursing home facilities, participated as part of the committee that worked for American Health Care Association in negotiating the current OBRA regulations, acted as counsel for a receiver in several cases involving nursing homes, both formally and informally, and has worked with a team on several "back to compliance" situations which involved either de-certification from Medicaid and/or Medicare or de-licensure. Some of these were in either state court foreclosure or bankruptcy court, where the primary goal in each was to bring facility into compliance and transfer ownership. The Debtors believe that Ms. Goldsmith has impeccable credentials and is otherwise qualified to assist the Debtors' to protect and preserve the Debtors' estates pending closing on the sale with Buyer.

---

[10] Ms. Selig is currently providing such services at Hollywood Hills on a part-time basis and has been providing such services for over 25 years preceding the Petition Date.

Accordingly, the Debtors submit that there would be minimal, if any, disruption to the nursing home operations. The Debtors submit that the Debtors' estates will be preserved pending sale of their assets, and patient care will not be compromised.

II. IN THE ALTERNATIVE, THE REPLACEMENT RECEIVER SHOULD BE DIRECTED TO PROVIDE AN ACCOUNTING, ASSIST THE DEBTORS TO COMPLY WITH THEIR REQUIREMENTS AS DEBTORS-IN-POSSESSION, AND TO PROVIDE ACCESS, INFORMATION AND COOPERATION NECESSARY TO FACILITATE A SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS.

As alternative relief, the Debtors request entry of an order directing the Replacement Receiver to provide (1) an accounting, (2) assistance to the Debtors in complying with their duties and obligations as debtors-in-possession, and (3) access, information and cooperation required by the Debtors to facilitate a sale of substantially all of their assets. Pursuant to § 543(b)(2), after the filing of a bankruptcy petition, a debtor-in-possession is entitled to an accounting from a receiver in possession of property of the estate. 11 U.S.C. § 543(b)(2). Indeed, although courts engage in a discretionary analysis with regards to turnover of the estate under § 543(b)(1), the requirement of § 543(b)(2) to provide an accounting is not dependent upon turnover of the estate from a receiver. *See e.g., In re Foundry of Barrington Partnership,* 129 B.R. 550, 558 (Bankr. N.D. Ill. 1991) (although a receiver was excused with compliance from § 543(b)(1), the court did not excuse compliance with the accounting requirement of § 543(b)(2)).

Here, the Debtors submit that an accounting from the Replacement Receiver is necessary so that the Debtors may adequately prepare schedules, statements, as well as comply with their reporting requirements under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules, and the UST Guidelines.

Additionally, where a debtor does not, or cannot, file its schedules or statement of financial affairs, the Court has the ability to direct "any party" to assist with the preparation. *See*

Fed. R. Bankr. P. 1007(k) ("If a list, schedule, or statement, other than a statement of intention, is not prepared and filed as required by this rule, the court may order the trustee, a petitioning creditor, committee, or other party to prepare and file any of these papers within a time fixed by the court"). Further, pursuant to Section 105(a), "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11]." 11 U.S.C. § 105(a).

Here, in the event the Court does not require turnover of the estate from the Replacement Receiver to the Debtors, the Debtors request the Court direct the Replacement Receiver to assist, cooperate, and otherwise provide the information to the Debtors to enable them to timely complete all schedules, statements, reports and lists required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, the Local Rules, as well as the UST Guidelines. Without these documents, the Debtors will experience increased and unnecessary difficulty in these cases. The Replacement Receiver should assist the Debtors in their efforts because even where a receiver remains in place "[t]he [d]ebtor retains the right to attempt to reorganize and the receiver should not interfere with that right." *See In re Foundry of Barrington Partnership,* 129 B.R. at 558 (requiring the receiver to cooperate with the debtor regarding the debtor's efforts to rent space in a shopping center).

Historically, the parties involved in the contemplated sale transaction had an inordinate amount of difficulty having their requests for due diligence necessary to complete the sale met by the Replacement Receiver. The stalking horse bidder of the Debtors' assets has indicated that if there is continued difficulty during the bankruptcy case, they will walk away from the contemplated transaction. The Debtors' request that if the Replacement Receiver is to remain in

place, they are provided with a broad order allowing for them to meet any and all due diligence requests from the stalking horse bidder or any other buyer.

### Local Rule 9075-1 Certification

I HEREBY CERTIFY that prior to filing this Motion, I discussed the relief requested in this Motion with counsel for the Replacement Receiver, as well as Gary Matzner, counsel for Larkin, neither of whom could not provide a response at the time, but indicated would review the Motion and respond thereafter.

### CONCLUSION

WHEREFORE the Debtors respectfully request this Court enter an order: (1) compelling the Replacement Receiver to turn over the Debtors' estate; or in the alternative, (2) directing the Replacement Receiver to provide (a) an accounting, (b) records, information and cooperation necessary for the Debtors to comply with their obligations and duties under the Bankruptcy Code as well as the UST Guidelines, and (c) access, information, and cooperation required by the Debtors to facilitate a sale of substantially all of their assets; and (3) granting such other relief as is just and proper.

DATED: April 10, 2015

**MARKOWITZ RINGEL TRUSTY &HARTOG, P.A.**
*Proposed Counsel for Debtors-in-Possession*
101 NE Third Avenue, Suite 1210
Fort Lauderdale, FL 33301
Tel: (954) 767-0030 // Fax: (954) 767-0035

By: /s/ *Grace E. Robson*
    Grace E. Robson, Esq.
    Fla. Bar No. 178063
    grobson@mrthlaw.com
    Timothy R. Bow, Esq.
    Fla. Bar No. 104710
    tbow@mrthlaw.com

559310.3