**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

IN RE:                                                    Case No.:

HIGH RIDGE MANAGEMENT CORP., *et al*.,[1]      Chapter 11
                                                          (Jointly Administered)

      Debtors.

_____/

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF (1) AN ORDER APPROVING (A) BIDDING PROCEDURES, (B) ASSUMPTION PROCEDURES, (C) THE FORM AND MANNER OF NOTICES, (D) SALE AGREEMENTS WITH STALKING HORSE BIDDER, AND (E) SCHEDULING AN AUCTION, A SALE HEARING, AND ESTABLISHING DATES AND DEADLINES RELATED THERETO; (2) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (B) GRANTING THE PURCHASER THE PROTECTIONS AFFORDED TO A GOOD FAITH PURCHASER, AND (C) GRANTING RELATED RELIEF**

_____

**\*EMERGENCY HEARING REQUESTED\***
**THE DEBTORS REQUEST A HEARING AS SOON AS POSSIBLE BASED UPON THE STRINGENT DEADLINES IMPOSED UNDER THE SALE AGREEMENTS, WHICH REQUIRES ENTRY OF A BIDDING PROCEDURES ORDER BY APRIL 24, 2015, AN AUCTION BY MAY 26, 2015, AND ENTRY OF A FINAL SALE ORDER BY JUNE 12, 2015.**

High Ridge Management Corp. and Hollywood Hills Rehabilitation Center, LLC (collectively, the "Debtors"), through undersigned counsel, pursuant to 11 U.S.C. §§ 105(a),363, 365 and § 1123(a)(5)(D), Bankruptcy Rules 2002, 6004, 6006, 9008, 9014, and Local Rules 6004-1, 6006-1 and 9075-1, request, on an emergency basis, the entry of: (1) an order (the "Bidding Procedures Order") in the form attached as **Exhibit 1,** approving (a) bidding procedures in the form attached as **Exhibit 1-A**, (b) assumption procedures, (c) the form and

---

[1] The following cases are jointly administered pursuant to this Court's *Order Jointly Administering Chapter 11 Cases* [ECF No. 10], *In re High Ridge Management, Corp.*, Case No. 15-16388-JKO, *In re Hollywood Hills Rehabilitation Center, LLC*, Case No. 15-16389-JKO, and *In re Hollywood Pavilion, LLC*, Case No. 15-16390-JKO.

manner of notices in the form attached as **Exhibit 1-B**, (d) that certain Asset Purchase Agreement (the "APA") by and between Hollywood Hills Rehabilitation Center, LLC ("Hollywood Hills") and Hollywood Hills Operator, LLC ("Operator"), and that certain Agreement for Purchase and Sale (the "Real Estate Agreement" and together with the APA, the "Sale Agreements") by and among High Ridge Management Corp. ("High Ridge") and Operator on one hand, and 1200 North 35th Avenue, LLC ("1200" and together with the Operator, the "Buyer" or "Stalking Horse Bidder"), on the other hand, in the form attached as **Exhibit 1-C**, and (e) scheduling an auction, a sale hearing, and establishing dates and deadlines related thereto; and (2) an order (the "Sale Order") in the form attached as **Exhibit 2**: (a) authorizing the sale of substantially all of the Debtors' assets, free and clear of liens, claims, and encumbrances, (b) granting the Buyer (or Successful Bidder[2]) the protections afforded to a good faith purchaser, and (c) granting related relief. In support of this motion (the "Sale Motion"), the Debtors state:

### *Procedural History*

High Ridge, Hollywood Hills, and Hollywood Pavilion, LLC ("Pavilion") filed voluntary petitions under Chapter 11 (the "Petitions") on April 8, 2015 (the "Petition Date"). Contemporaneously with the filing of the Petitions, High Ridge moved on an *ex parte* basis to jointly administer the Debtors' bankruptcy cases [*See* Lead Case, ECF No. 5]. Joint administration of the Debtors was granted on April 10, 2015 [Lead Case, ECF No. 10].

---

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to such terms in the Sale Agreements or the Bidding Procedures.

***Description of Debtors***

High Ridge, Hollywood Hills, and Pavilion are affiliated entities. High Ridge is the one-hundred percent (100%) owner of the membership interests in Pavilion and Hollywood Hills. High Ridge owns real property located at 1200 North 35th Avenue and 1201 North 37th Avenue, Hollywood Florida (the "Real Property"), and is the landlord of Pavilion and Hollywood Hills. Before executing a management agreement with Larkin (defined and discussed below), Pavilion operated a fifty (50) bed Florida-licensed mental health hospital on the Real Property. Before the appointment of a receiver, Hollywood Hills operated a one hundred fifty-two (152) bed Florida-licensed nursing home on the Real Property.

For a more detailed description of the events preceding the commencement of these cases, the Debtors refer parties to the *Debtors' Emergency Motion for Turnover of the Estate, or in the Alternative, for Entry of an Order Directing the Receiver to Provide (1) an Accounting, (2) Information Required by the Debtors to Comply with their Obligations and Duties as Debtors-in-Possession, and (3) Information Required by the Debtors to Facilitate a Sale of Their Assets* (the "Motion for Turnover") [ECF No. 12].

## CONCISE STATEMENT OF THE RELIEF REQUESTED PURSUANT TO LOCAL RULE 6004-1(B)

High Ridge and Hollywood Hills are seeking approval of a sale of substantially all of their assets and business operations to the Stalking Horse Bidder, or such other party that makes the highest and best offer at a public auction. The Debtors request approval of bidding procedures, notice procedures, auction and sale hearing dates, and the terms of the Sale Agreements with the Buyer. In addition, the Debtors request that the Court schedule a hearing to approve the sale to the Successful Bidder, as well as to approve the assumption and assignment of various contracts. For the reasons set forth in this Sale Motion, the Debtors' believe a sale of

their assets by public auction is in the best interests of the Debtors' creditors and equity interests and should be approved.

### Summary of the Proposed Sale[3] and Auction Terms

As more fully detailed in the Sale Agreements, and as summarized below, the Debtors propose to enter into a transaction whereby the Buyer will pay $17,000,000.00 to acquire substantially all of the assets of High Ridge and Hollywood Hills (collectively, the "Purchased Assets"). The following chart summarizes the terms and conditions of the proposed sale and terms of the proposed auction.

| Terms of Sale | |
| --- | --- |
| Term | Description |
| Sellers | High Ridge Management Corp. and Hollywood Hills Rehabilitation Center, LLC |
| Buyers | 1200 North 35th Avenue, LLC and Hollywood Hills Operator, LLC<br><br>Neither of the referenced buyers is an insider of any of the Debtors |
| Purchase Price | $17,000,000, Real Estate Agreement, Section 2.00 |
| Description of Purchased Assets | APA, Section 2.1<br><br>All of Sellers' right, title and interest in, to and under all of the assets, properties, goodwill and rights of Hollywood Hills used in the conduct of the Business of every nature, kind and description, tangible and intangible, wherever located, whether or not carried on the books of Seller (other than the Excluded Assets (as defined in Section 2.2 of the APA), including, but not limited to: (i) licenses and authorizations; (ii) intellectual property; (iii) computer programs; (iv) web sites; (v) personal property; (vi) information and records; (vii) Assumed Contracts; (viii) marketing materials; (ix) resident agreements; (x) other intangibles; (xi) permits; and (xii) cause of action relating to the Business and Purchased Assets.<br><br>Real Estate Agreement, Section 1.00<br><br>All of Sellers' right, title and interest in: (i) the Property, together with all appurtenances, rights, easements and rights of way incident thereto, (ii) all buildings and all other structures, facilities or improvements presently or hereafter located in or on the Land (the "Improvements"), including without limitation, that |

---

[3] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Sale Agreements. To the extent that the summary and terms of the Sale Agreements conflict, the terms of the Sale Agreements shall control.

| | |
|---|---|
| | certain 152 bed nursing home facility commonly known as Hollywood Hills Rehabilitation Center (the "Facility"), and all other items of furniture, fixtures, equipment and any other personal property attached or appurtenant to, located on or used in connection with the ownership, use, operation or maintenance of the Improvements and/or the Facility (collectively, the "Personal Property"), other than the Supplies (as such term is defined in the APA) which shall be transferred to Buyer pursuant to the APA (iii) all right, title and interest, if any, of Seller in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof, (iv) all right, title and interest, if any, of Seller to any unpaid award for (1) any taking by condemnation or (2) any damage to the Land or the Improvements by reason of a change of grade of any street or highway, (v) all easements, licenses, rights and appurtenances relating to any of the foregoing, (vi) all intangible property of Seller; (vii) all of the goodwill symbolized and associated with the Facility, and (vii) any bed rights and other assets located at or used in connection with the Facility. |
| Warranties | Real Estate Agreement, Section 10.00<br><br>APA, Sections 5 and 6 |
| Closing Date | As soon as all closing conditions are satisfied.<br><br>Real Estate Agreement, Section 5.00 and APA, Section 11.1. |
| Closing Conditions | Real Estate Agreement, Section 6.03 and 6.04<br><br>Compliance with agreement, possession and delivery of Property free and clear of all liens, claims, encumbrances and other occupancies (except for the tenancy of Larkin Community Hospital), consummation of the APA, Buyer obtains satisfactory Phase II environmental report, no material adverse change, lease agreement entered into between Buyer and or Seller, and Larkin Community Hospital with respect to the operation of the psychiatric hospital in a specified portion of the Property.<br><br>APA, Section 10<br><br>Approval of change of ownership of license from Hollywood Hills to Buyer, entry of the Bidding Procedures Order on final basis, entry of Sale Order on final basis, assumption and assignment of contracts to Buyer by order of the Bankruptcy Court, any necessary approvals of the U.S. District Court in connection with Case No. 12-23601 and/or the U.S. Dept. of Justice, closing on the transactions subject of the Real Estate Agreement, delivery of Closing deliveries. |

| Auction Terms | |
|---|---|
| Proposed Auction Date | May 26, 2015 at 10:00 a.m. at the offices of Markowitz Ringel Trusty & Hartog, PA, 101 NE Third Avenue, Suite 1210, Fort Lauderdale, Florida |
| Minimum incremental bids | $100,000 in excess of the highest Qualified Bid (or such other amounts and terms that the Debtors determine will result in the highest and best offer) |
| Initial Overbid Amount | $17,770,000 |
| Overbid Deadline | May 22, 2015 at 4:00 p.m. (Eastern time) |
| Minimum Deposit | $500,000 |
| Documentation Requirements | Submit to the Debtors an executed asset purchase agreement for the purchase of substantially all of the Purchased Assets and assumption of all Assumed Liabilities, which shall be made upon terms and conditions substantially similar to and no less economically favorable to the Debtors then those contained in the Sale Agreements with the Buyer, and must be accompanied by forms of the Sale Agreements that specifically sets forth those amendments and modifications to the Sale Agreements, including price, terms, agreements to be assumed, and liabilities not to be assumed, which such bidder would propose if it were selected as the Successful Bidder; proof of ability to close on the sale; documents showing the Qualified Bidder's good faith |
| Breakup Fee & Expense Reimbursement | Breakup fee of $595,000<br><br>Expense reimbursement of $75,000<br><br>*The Buyer shall get a credit in the amount of the Breakup Fee and Expense Reimbursement through each round of bidding. |

### Statement Regarding Personally Identifiable Information
### Pursuant to Local Rule 6004-1(B)(6)

The APA contemplates the sale and transfer of medical records, which contain personally identifiable information. The Debtors submit that a consumer privacy ombudsman is not necessary or required because the sale of the Purchased Assets is to an entity that will maintain and preserve the personally identifiable information in a manner consistent with all applicable privacy laws, including HIPAA.[4] Further, the Sale is contingent on the Florida Agency for

---

[4] HIPAA is an acronym for the Health Insurance Portability and Accountability Act.

Healthcare Administration ("AHCA") approving the transaction, which agency presumably would not approve the transfer of the nursing home license to an entity that did not have policies and procedures in place to conform to privacy laws regarding medical and personal information.

### Known and Potential Lienholders Pursuant to Local Rule 6004-1(B)(7)

Pursuant to a search of the public records regarding recorded documents, judgment liens, federal liens and UCC filings, the Debtors have identified the following parties that may assert a lien, claim, encumbrance or other interest regarding the Purchased Assets:

| Holder of Lien or Interest | Nature and Extent of Lien/Interests | Disputed (Y/N) |
|---|---|---|
| Hollywood Property Investments, LLC ("HPI") | HPI is the holder of Loan Documents under which High Ridge is the borrower, and Hollywood Hills and Pavilion are guarantors.<br><br>HPI holds a lien against the Real Property, and asserts a lien on the business assets of Hollywood Hills and Pavilion<br><br>Upon information and belief, HPI asserts that it is owed approximately $14 million | Yes as to the extent of the debt asserted |
| Broward County Records, Taxes and Treasury Division | Ad Valorem taxes for 2015 regarding Real Property owned by High Ridge | No |
| ACHA | AHCA may assert a lien for unpaid amounts owed to it by one or more of the Debtors | |
| United States of America | United States may assert a lien | Yes |
| Gulf South Medical Supply | UCC-1 filing regarding mattress pressure guard with reach welcome kit/Equipment Account #42049459 | |
| Financial Servicing, LLC | UCC-1 filing regarding Avaya phone system | |
| Milner Document Products, Inc. | Equipment under Usage Agreement #7533561-001 | |

### *Statement Regarding Need for Accelerated Hearings Pursuant to Local Rule 6004-1(B)(8)*

The Debtors request that the Court consider this Sale Motion on an emergency basis because the Sale Agreements provide for the following deadlines to conduct an auction and close on the sale:

| Deadline | Description |
| --- | --- |
| Within 15 days of the Petition Date | Access to the Property to conduct a Phase II environmental site assessment, APA, Section 12.2 |
| April 24, 2015 | Entry of the Bidding Procedures Order |
| May 26, 2015 | Commencement of Auction |
| May 28, 2015 | Entry of Sale Order |
| June 12, 2015 | Final, non-appealable Sale Order |

### *Prepetition Marketing Efforts*

The Debtors submit that the proposed dates and deadlines for an auction, sale hearing and entry of a sale order are reasonable in light of the marketing efforts that took place prior to the commencement of these cases. Beginning in approximately July 2013, the Debtors engaged in discussions with and solicited offers to purchase the assets of Pavilion from potential acquirers. In September 2013, in an effort to elicit the highest and best offer for Pavilion's assets, the Debtors conducted a reverse auction from among the five (5) potential acquirers that had expressed the most interest at the highest price for Pavilion's Assets. Bidders were asked to submit written bids which were above a minimum aggregate purchase price (that was higher than any prior offer received by the Debtors) and to make any proposed changes to pro-forma sale documents. This process resulted in three (3) formal offers. The Debtors analyzed the totality of the offers (including price and other terms such as the potential acquirer's willingness to assume operations and responsibility for any continued losses prior to closing), and selected the highest

and best offer. This resulted in sales contracts that were executed, but not closed, as of the Petition Date.

The first set of agreements was between Pavilion and Larkin Community Hospital ("Larkin"). The transactions with Larkin included Larkin's written agreement to manage Pavilion's business (the "Management Agreement") pending closing on the Asset Purchase Agreement of Pavilion's assets (the "Larkin APA"). As part of the Larkin APA, it was contemplated that High Ridge would enter into a lease agreement with Larkin for the use of the Real Property at the time of closing on the Larkin APA.[5]

Beginning in May 2014, the Debtors engaged in efforts to market and sell the assets of High Ridge and Hollywood Hills, including contacting numerous potential bidders – both those that had previously expressed interest in the assets of Pavilion and Hollywood Hills, and other potential acquirers that had subsequently expressed an interest. The Debtors then solicited offers from potential acquirers at a purchase price that met or exceeded the appraised value of the assets based on an appraisal commissioned by the initial state court receiver.[6] This marketing effort resulted in a set of agreements, including that certain Asset Purchase Agreement, dated December 17, 2014, by and between Hollywood Hills and Operator, and that certain Purchase and Sale Agreement, dated December 17 2014, by and among High Ridge and Hollywood Hills on one hand, and 1200, on the other hand (collectively, the "Hollywood Hills Agreements"). The Hollywood Hills Agreements provided for the sale of the Real Property, including assignment to

---

[5] The assets subject to the Larkin APA include the hospital license and personalty related to the hospital operations. Upon information and belief, the only remaining issue before the Larkin APA transaction can close is approval by AHCA of the change of ownership application of the hospital license from Pavilion to Larkin, and payment to Pavilion of the purchase price.

[6] Prior to the Petition Date, the Debtors were parties to a state court foreclosure action filed by Stabilis Fund II, LLC ("Stabilis"), who was the secured creditor of High Ridge at the time. Stabilis sought and obtained the appointment of a receiver.

1200 of any lease between High Ridge and Larkin regarding the Real Property, as well as the sale of substantially all of the assets of Hollywood Hills.

The Buyer has agreed to act as a "stalking horse" in connection with a sale to be conducted in accordance with the Bankruptcy Code. Accordingly, the parties negotiated the Sale Agreements, which replace and supersede the Hollywood Hills Agreement in their entirety. The Sale Agreements, which remain subject to the approval of this Court, are attached as **Exhibit 1-C**.

The significant terms of the Sale Agreements are summarized above, so will not be repeated here. ***Parties should review the Sale Agreements in their entirety and not rely solely upon the summaries included herein***.

### *Delays Encountered Regarding Hollywood Hills Agreements*

As indicated above, prior to the Petition Date, through extensive arms'-length negotiations, High Ridge and Hollywood Hills received an offer from the Stalking Horse Bidder to acquire substantially all of their assets and business operations. The Stalking Horse Bidder's efforts to obtain diligence, which were required as part of the Hollywood Hills Agreements, were complicated and delayed by the Replacement Receiver[7], and the parties were not able to close on the transaction prior to the Petition Date. For example, the Replacement Receiver would not permit an environmental consultant to access the Real Property to conduct a Phase II environmental site assessment, an ordinary requirement for transactions involving real estate, and one that would not disrupt business operations. Accordingly, the Debtors filed Chapter 11 to, among other things, facilitate the sale to the Stalking Horse Bidder.

---

[7] Stabilis assigned the loan documents to HPI, who replaced the initial receiver with Jon H. Steinmeyer, who is serving as the replacement receiver (the "Replacement Receiver"), pursuant to the *Amended Order Appointing Receiver*, dated April 29, 2014 entered by the Circuit Court, in and for Broward County, Case No. 13-026516(12).

### *The Bidding Procedures*

The Bidding Procedures provide detail on the date, time, location of the Auction and Sale Hearing, Overbid Requirements, including requirements for a party to become a Qualified Bidder and what constitutes a Qualified Bid, as well as general terms governing the Auction.

As indicated above, the Debtors propose to conduct the auction (the "Auction") on **May 26, 2015 at 10:00 a.m**. at the office of counsel for the Debtors. The Debtors request that the Court schedule a hearing to approve the Auction results on **May 27, 2015**, one (1) day after the Auction (the "Sale Hearing").

The Bidding Procedures provide that the Stalking Horse Bidder shall be deemed a Qualified Bidder and allows other interested parties to submit Qualified Bids for the Purchased Assets. In sum, in order to be considered a "Qualified Bid," a bidder must, prior to the Overbid Deadline, submit: (1) a written offer, (2) a minimum overbid of $17,770,000.00, (3) a good faith deposit of $500,000.00, (4) proof of financial ability to close on the transaction, and (5) proof of the Qualified Bidder's good faith. Bidding at the Auction will be limited to Qualified Bidders who have submitted Qualified Bids in advance of the Overbid Deadline. The Debtors propose that the bidding shall proceed in increments of $100,000.00, or such other amounts and terms the Debtors determine will result in the highest and best offer for the Purchased Assets. The Bidding Procedures allow for the Debtors, in their business judgment, to select among the Qualified Bids the highest and best offer for the Purchased Assets.

The other significant provisions of the proposed bidding procedures are summarized on page 6 above, and the full provisions are attached as Exhibit 1-A, so those provisions will not be repeated here. ***Parties should review the proposed Bidding Procedures in their entirety and not rely solely upon the summaries discussed herein***.

## FORM AND MANNER OF NOTICE OF SALE

Subject to entry of the Bidding Procedures Order, on or within three (3) business days of entry of the Bidding Procedures Order, the Debtors will cause the notice, substantially in the form attached as **Exhibit 1-B** to be served on the following parties or their respective counsel, if known: (a) the Office of the United States Trustee for the Southern District of Florida; (b) the entities listed on the List of Creditors Holding the 20 Largest Unsecured Claims; (c) HPI; (d) the Buyer; (e) all parties who have expressed a written interest in acquiring some or all of the Debtors' assets; (f) all known holders of liens, claims, and other encumbrances secured by the assets constituting the Purchased Assets; (g) all applicable federal, state, and local taxing authorities, including the Internal Revenue Service; (h) all known creditors of the Debtors, as reflected in the Debtors' books and records as of the Petition Date; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that the Sale Hearing Notice is reasonably calculated to provide interested parties with notice of the sale and Sale Hearing and an opportunity to respond accordingly.

## ASSUMPTION PROCEDURES

The Debtors are also seeking approval of procedures (the "Assumption Procedures") to facilitate the fair and orderly assumption and assignment of all executory contracts and unexpired leases subject of the Sale Agreements (the "Assumed Contracts").

The Debtors request that the Court approve (a) the process by which the Debtors will serve notice to affected counterparties (the "Counterparties") regarding the proposed assumption and assignment and related cure amounts, if any, (b) the form of notice in the form attached as part of **Exhibit 1-B** (the "Assumption and Assignment Notice") informing Counterparties of their right and the procedures to object thereto; and (c) the proposed objection and other relevant

deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assumed Contracts to the extent necessary.

The Assumption and Assignment Notice contains a list identifying the Counterparties, the amount, if any, determined by the Debtors to be necessary to be paid (the "Cure Amounts") as of the date of the Assumption and Assignment Notice, the deadline for Counterparties to object, details on what any objection must include, as well as the details on where to file any such objection. The Debtors propose to serve the Assumption and Assignment Notice to the Counterparties by regular U.S. mail, postage prepaid. The Debtors submit that the proposed Assumption Procedures is appropriate under the circumstances, and that service of the Assumption and Assignment Notice shall be sufficient to provide each of the Counterparties notice and an opportunity to be heard regarding the proposed assumption and assignment of the Assumed Contracts.

<u>**LEGAL BASIS FOR REQUESTED RELIEF**</u>

**I.      THE COURT SHOULD APPROVE THE SALE OF THE PURCHASED ASSETS PURSUANT TO SECTION 363(b) OF THE BANKRUTPCY CODE.**

Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Section 363 of the Bankruptcy Code does not set forth a standard for determining when a sale or disposition of property of the estate should be authorized, courts generally authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169,176 (D. Del. 1991).

Specifically, courts consistently hold that the sale of estate assets outside the ordinary course of business is appropriate if: (a) there is a sound business purpose for the sale; (b) the proposed sale price is fair; (c) the debtor has provided interested parties with adequate and reasonable notice; and (d) the buyer has acted in good faith. *See, e.g., In re Exaeris, Inc*., 380 B.R. 741, 744 (Bankr. D. Del. 2008); *In re Decora Indus., Inc*., 2002 WL 32332749, at *7, 8 (D. Del. May 20, 2002).

Moreover, if a valid business justification exists for the sale of property of the estate, a debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors…acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc*., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Bridgeport Hldgs., Inc*., 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets).

Parties objecting to the debtor's decision to sell property of the estate must make a showing of "bad faith, self-interest or gross negligence." *Integrated Res*., 147 B.R. at 656; *see also In re Johns-Manville Corp*., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."). Accordingly, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Section 363(b)(1) of the Bankruptcy Code. For the following reasons, the Debtors respectfully submit that selling the Purchased Assets to the Buyer is a sound exercise of their business judgment.

Here, the Debtors respectfully submit that sound business reasons support their decision to enter into the Sale Agreements. The Debtors respectfully submit that it is reasonably likely that no bidder will submit a bid approaching, let alone exceeding, the amount of the Buyer's potential bid. Additionally, the transaction will enable the Debtors to expeditiously complete their Chapter 11 restructuring. Accordingly, the Debtors, in their sound business judgment, believe that sale of the Purchased Assets to the Buyer is in the best interests of their estate and that the proposed transaction should be approved by the Court pursuant to section 363(b) of the Bankruptcy Code.

## II.   THE COURT SHOULD AUTHORIZE THE SALE OF THE PURCHASED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, AND OTHER INTERESTS PURSUANT TO SECTION 363(f) OF THE BANKRUPTCY CODE.

The Debtors also seek to sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of any interest in such property if: (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property; (d) such interest is in *bona fide* dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements is sufficient to permit the sale of the Purchased Assets "free and clear" of liens and interests. *In re Kelistrom Indus., Inc*., 282 B.R. 787, 793 (Bankr. D. Del. 2002); *In re Decora Indus., Inc.*, 2002 WL 32332749, at *7; *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988); *In re Levitt & Sons, LLC,* 384 B.R. 630, 647 (Bankr. S.D. Fla. 2008) ("Section

15

363(f)(3) permits the sale of property free and clear of all liens provided one of its 5 sub-sections is applicable"). The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to Section 105 of the Bankruptcy Code, even if section 363(f) does not apply. *See In re Trans World Airlines, Inc*., 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001).

The Debtors respectfully submit that Section 363(f) of the Bankruptcy Code will be satisfied with respect to the transfer of the Purchased Assets pursuant to the Sale Agreements or by sale to the Successful Bidder. Specifically, the Buyer proposes to purchase the Purchased Assets as contemplated by section 363(f)(3) of the Bankruptcy Code. Pursuant to that provision, a debtor may sell property free and clear of liens, claims, and encumbrances if "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property." 11 U.S.C. § 363(f)(2). The Debtors submit that HPI's lien on the Real Property is well below the price at which the Debtors propose to sell the Purchased Assets to the Buyer. Accordingly, the Debtors respectfully submit section 363(f) of the Bankruptcy Code will be satisfied and, accordingly, request that the Purchased Assets be transferred to the Buyer free and clear of all liens, claims, security interests, and encumbrances.

**III.    THE COURT SHOULD GRANT THE BUYER THE FULL PROTECTIONS AFFORDED TO A GOOD FAITH BUYER PURSUANT TO SECTION 363(m) OF THE BANKRUPTCY CODE.**

Section 363(m) of the Bankruptcy Code provides, in relevant part: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code thus protects a purchaser

of assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit has stated that a good faith purchaser is "one who purchases in 'good faith' and for 'value.'" *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986). To constitute a lack of good faith, a party's conduct in connection with the sale usually must amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

Here, there is no fraud or collusion between the Buyer or any of its affiliates and the Debtors. The Debtors and the Buyer engaged in extensive arms'-length discussions in negotiating the Sale Agreements. The Debtors and the Buyer were represented by separate counsel in connection with the negotiation and documentation of the Sale Agreements. Accordingly, the Debtors request that the Court determine that the Buyer has negotiated and acted at all times in good faith and, as a result, is entitled to the full protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code, and that the Sale Agreements do not constitute an avoidable transaction pursuant to Section 363(n) of the Bankruptcy Code.

## IV.    THE BIDDING PROCEDURES SHOULD BE APPROVED.

The Bidding Procedures set forth in Exhibit 1-A provide incentive for the Buyer to serve as the "stalking horse bidder" in connection with the Debtors' efforts to sell the Purchased Assets. Specifically, the Buyer has invested significant time and money in its efforts to negotiate the terms of the Sale Agreements. Applying the business judgment rule, courts generally approve bidding procedures similar to the Bid Procedures proposed by the Debtors. The business judgment rule proscribes judicial second guessing of the actions of a corporation's board of

directors, taken in good faith and in the exercise of honest judgment. *See Cottle v. Storer Communications, Inc.,* 849 F.2d 570 (11th Cir.1988) (break-up fee arrangements outside bankruptcy are presumptively valid under the business judgment rule); *In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1992) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking"); *see also In re Marrose Corp.*, 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) (bidding incentives are "meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

In addition, the Third Circuit looked to Section 503 of the Bankruptcy Code to determine whether bidding procedures are appropriate in a bankruptcy sale context. *See Calpine Corporation v. O'Brien Environmental Energy, Inc*., 181 F.3d 527 (3rd Cir. 1999).  The Circuit Court considered whether, under Section 503, the bidding procedures provided a benefit to the estate. In *O'Brien*, the Court analyzed whether the bidding procedures promoted competitive bidding and whether they assisted in obtaining the true value of the debtor's assets.

The Debtors submit that the Bid Procedures are consistent with the Debtors' business judgment and will provide a measureable benefit to the Debtors' estates. The Debtors further submit that the Bid Procedures provide a fair and reasonable means of ensuring that the Purchased Assets are sold for the highest or best offer attainable. The Debtors will cooperate fully with any party interested in submitting a competing offer to conduct due diligence in an effort to generate a competing offer. Moreover, the Bid Procedures enable Qualified Bidders to formulate revised bids at the Auction. Based upon the foregoing, the Debtors request the Bid Procedures be approved by the Court as it is in the best interests of the estate.

**V.    THE FORM AND MANNER OF NOTICE OF THE SALE SHOULD BE APPROVED.**

Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with twenty-one (21) days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Sale Hearing and the deadline for filing any objections to the relief requested herein. As noted above, within three business days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Hearing Notice upon the parties listed on page 12, above. The Debtors respectfully submit that the Sale Hearing Notice is reasonably calculated to provide interested parties with notice of the sale and Sale Hearing and an opportunity to respond accordingly. Accordingly, the Debtors submit that service of the Sale Hearing Notice as provided for herein, constitutes good and adequate notice of the sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

**VI.    THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS SHOULD BE APPROVED.**

**A.    <u>The Assumption and Assignment of the Assumed Contracts Reflects the Debtors' Reasonable Business Judgment</u>.**

Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. 11 U.S.C. § 365. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage."); *In re*

*Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard..."); *In re Chira,* 343 B.R. 361, 366 (Bankr.S.D.Fla. 2006) (considering the business judgment standard in deciding whether to assume executory contract).

Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the sale as a sound exercise of the Debtors' business judgment. First, the Assumed Contracts are necessary to run the Debtors' estates' various businesses, and as such, they are essential to inducing the best offer for the Purchased Assets. Second, it is unlikely that any purchaser would want to acquire any company on a going-concern basis unless a significant number of the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction. Third, Section 10.2 of the APA provides that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, the sale. Finally, the Assumed Contracts will be assumed and assigned though the process approved by the Court pursuant to the Sale Order and, thus, will be reviewed by key constituents in these Chapter 11 cases. Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

   B. **Defaults Under the Assumed Contracts Will Be Cured Through the Sale**.

Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of Section 365(b) of the Bankruptcy Code: (a) that a debtor cure, or provide adequate assurance of promptly curing, prepetition defaults in the

executory contract; (b) compensate parties for pecuniary losses arising therefrom; and (c) provide adequate assurance of future performance thereunder.

This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *Matter of Luce Indus., Inc*., 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980), rev'd on other grounds 14 B.R. 529.

The Debtors submit that the statutory requirements of § 365(b)(1)(A) will be satisfied (and promptly) because the Sale Agreements require that the Debtors cure all defaults associated with the Assumed Contracts. *See* APA, Section 4.4. Because the Sale Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

**C.  <u>Non-Debtor Parties Will be Adequately Assured of Future Performance</u>.**

Similarly, the Debtors submit that the third requirement of Section 365(b)(1)(C) of the Bankruptcy Code for the Debtors to provide adequate assurance of future performance is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp*., 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "assurance of future performance is adequate if performance is likely (i.e. more probable than not); the degree of assurance necessarily falls considerably short of an absolute guaranty." *In re Prime Motor Inns, Inc*., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Buyer will be satisfied. Section 4.4 of the APA requires the Buyer to provide adequate assurance of future performance to the extent required as to any Seller Contract that is to be assumed and assigned. The Debtors believe that the Buyer has the financial wherewithal, willingness, and ability to perform under the Assumed Contracts proposed to be assumed and assigned. Further, the Assumption Procedures provides the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Buyer to provide adequate assurance of future performance and object to the assumption and assignment of the Assumed Contracts or proposed cure amounts. The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Assumed Contracts as set forth in the Sale Agreements.

## SATISFACTION OF BANKRUPTCY RULE 6004(h)

To implement the foregoing successfully, the Debtors request that the Court enter an order providing that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h). To maximize the value of the Purchased Assets and preserve the viability of the Debtors' business as a going concern, it is essential that the sale occur within the time constraints set forth in the Sale Agreements. The Buyer's failure to consummate the sale would prevent the Debtors' estates from realizing significant value from the

proposed sale transaction. Therefore, the Debtors request a waiver of the 14-day stay period under Bankruptcy Rule 6004(h).

## REQUEST FOR WAIVER OF LOCAL RULE 9075-1 REQUIREMENT

The Debtors requests a waiver of the requirement to certify that a bona fide effort was made to resolve the matter in advance of filing as the relief requested does not lend itself to advance resolution.

WHEREFORE, the Debtors respectfully request that the Court: (1) grant the Sale Motion; (2) enter an order, substantially in the form of the attached **Exhibit 1**, approving (a) bidding procedures in the form attached as **Exhibit 1-A**, (b) assumption procedures, (c) the form and manner of notices in the form attached as **Exhibit 1-B**, (d) the Sale Agreements with Buyer in the form attached as **Exhibit 1-C**, and (e) scheduling an auction, a sale hearing, and establishing dates and deadlines related thereto; (3) enter an order, substantially in the form of the attached **Exhibit 2**, (a) authorizing the sale of substantially all of the Debtors' assets, free and clear of liens, claims, and encumbrances, (b) granting the Buyer (or Successful Bidder) the protections afforded to a good faith purchaser, and (c) granting related relief.

DATED: April 10, 2015

**MARKOWITZ RINGEL TRUSTY & HARTOG, P.A.**
*Proposed Counsel for Debtors-in-Possession*
101 NE Third Avenue, Suite 1210
Fort Lauderdale, FL 33301
Tel: (954) 767-0030 // Fax: (954) 767-0035

By: /s/ *Grace E. Robson*
       Grace E. Robson, Esq.
       Fla. Bar No. 178063
       grobson@mrthlaw.com
       Timothy R. Bow, Esq.
       Fla. Bar No. 104710
       tbow@mrthlaw.com

560074.5