## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

IN RE:                                                    Case No.: 15-16388-JKO

HIGH RIDGE MANAGEMENT CORP., *et al.*,[1]          Chapter 11
                                                          (Jointly Administered)

     Debtors.

_____/

### NOTICE OF FILING SALE AGREEMENTS WITH SUCCESSFUL BIDDER

High Ridge Management Corp. and Hollywood and Hills Rehabilitation Center, LLC, file

the attached copies of the Asset Purchase Agreement and the Agreement for Purchase and Sale

with Hollywood Property Investments, LLC[2], as follows:

    Exhibit 1.    *Asset Purchase Agreement*[3]

    Exhibit 2.    *Agreement for Purchase and Sale*

DATED: June 26, 2015        **MARKOWITZ RINGEL TRUSTY & HARTOG, P.A.**
                      *Counsel to the Chapter 11 Debtors*
                      101 NE Third Avenue, Suite 1210
                      Fort Lauderdale, FL 33301
                      Tel: (954) 767-0030 // Fax: (954) 767-0035

                      By: /s/ *Grace E. Robson*_____
                          Grace E. Robson, Esq.
                          Fla. Bar No. 178063
                          grobson@mrthlaw.com
                          Timothy R. Bow, Esq.
                          Fla. Bar No. 104710
                          tbow@mrthlaw.com

586781

---

[1] The following cases are jointly administered pursuant to this Court's *Order Jointly Administering Chapter 11 Cases* [ECF No. 10], *In re High Ridge Management, Corp.*, Case No. 15-16388-JKO, *In re Hollywood Hills Rehabilitation Center, LLC,* Case No. 15-16389-JKO, and *In re Hollywood Pavilion, LLC*, Case No. 15-16390-JKO.

[2] Hollywood Property Investments, LLC was the party deemed to make the highest and best bid for substantially all of the assets of High Ridge Management Corp. and Hollywood Hills Rehabilitation Center at the auction conducted on June 24, 2015. *See* ECF No. 219. The attached sale agreements reflect the terms of the successful bid.

[3] Schedule 8.2 to the Asset Purchase Agreement (other than first page) is not attached as it contains private information personal to employees.

**<u>EXHIBIT 1</u>**

Execution Copy

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of the 26th day of June, 2015 (the "Effective Date"), by and between HOLLYWOOD HILLS REHABILITATION CENTER, LLC, a Florida limited liability company ("Seller"), and HOLLYWOOD PROPERTY INVESTMENTS, LLC, a Florida limited liability company and/or its permitted assigns ("Buyer").

### Recitals

A.      Seller owns and operates Hollywood Rehabilitation Center, a one hundred fifty-two (152) bed Florida-licensed nursing home (the "Facility") engaged in the business of providing long-term and rehabilitation care services through various health care service providers (collectively, the "Service Providers") (herein referred to as the "Business");

B.      Seller desires to sell, transfer and assign to Buyer, and Buyer desires to purchase from Seller, pursuant to sections 105, 363 and 365 of the Bankruptcy Code (as defined below), substantially all of the assets used in the Business upon the terms and conditions set forth in this Agreement;

C.      In connection with the foregoing, High Ridge Management Corp., a Florida corporation ("Realty") shall, simultaneously with this agreement, enter into that certain Agreement for Purchase and Sale with Hollywood Property Investments, LLC, a Florida limited liability company ("Real Estate Buyer"), of even date herewith (the "Purchase and Sale Agreement"), for acquisition of the real estate and other assets relating to the Facility;

D.      The transactions contemplated herein are subject to the approval of the Bankruptcy Court and the District Court (each as defined and described below) and will be consummated only pursuant to the Sale Order (as defined and described below) to be entered in the Bankruptcy Cases (as defined and described below).

### Agreements

In consideration of the mutual promises, representations, warranties, covenants and agreements contained herein, the parties agree as follows:

1.      **Recitals**. The foregoing recitals are true and correct and expressly incorporated herein.

2.      **Purchase and Sale of Assets**.

2.1      Assets Purchased. Subject to the terms and conditions of this Agreement, at the Closing (as defined in Section 11.1), Seller shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall acquire and take assignment and delivery of all of Seller's right, title and interest in, to and under all of the assets, properties, goodwill and rights of Seller used in the conduct of the Business of every nature, kind and description, tangible and intangible, wherever located, whether or not carried on the books of Seller (other than the Excluded Assets (as defined

below)) (each referred to herein as an "Asset" and collectively as the "Assets"). Without limiting the generality of the foregoing, the Assets include the following:

(i)    Licenses and Authorizations. All transferable rights of Seller in and to any and all licenses and other regulatory approvals necessary for or incident to the operation of the Assets, and any third party warranties relating to the Assets, including without limitation, any transferrable rights in and to the nursing home license #1238096 ("Provider License") issued by the Florida Agency for Health Care Administration ("AHCA") (which will be subject to a change of ownership application and new license, which Buyer shall promptly apply for and use best efforts to obtain as soon as reasonably possible), and the Medicaid and Medicare provider agreements held  by Seller (the "Provider Agreements");

(ii)    Intellectual Property. All registered and unregistered intellectual property rights (patents, trademarks, trade secrets, service marks, trade names, corporate names, copyrights and applications therefore) used in connection with the Business, including, without limitation, licenses for the use of computer software programs and the following trade names and logos: "Hollywood Hills Rehabilitation Center" and all goodwill associated therewith (collectively, the "Intellectual Property");

(iii)    Computer Programs. All computer hardware, software, and computer training or instructional materials owned by Seller and used in connection with the Business;

(iv)    Web Sites. All Internet domain names, web sites and software used in connection with the Business as listed on Schedule 2.1(iv) hereto, including all agreements and files relating thereto such as (a) hyperlink agreements, (b) agreements relating to the use of Seller's Intellectual Property on web sites, and (c) agreements and files relating to the hosting, development, local search marketing or other aspects of Seller's web sites;

(v)    Personal Property. All medical supplies, linens, food and other supplies used by Seller in the operation of the Facility ("Supplies");

(vi)    Information and Records. All books, patient records, employee records, files, databases, plans, specifications, technical information, confidential information, price lists, promotional materials, advertising copy and data, marketing research and information, competitive analyses, sales records, service records, files and lists of current patients who will be required to be serviced after Closing, Service Provider lists and background checks, material correspondence related to any Seller Contract or Service Provider, business plans, projections, budgets, personnel and labor relations records, and employee benefits and compensation plans and records in Seller's care, custody or control (collectively, the "Information and Records");

(vii)    Assumed Contracts. All rights in, to and under any and all Contracts (as defined herein) to which Seller is a party or may be bound or receive benefits or by which the Assets may be affected which are set forth in Schedule 2.1(viii) and are assumed by Seller and assigned to Buyer pursuant to Section 4.4, including, without limitation, all contracts with Service Providers and clients, except for the Excluded Contracts (as defined in Section 2.2) (collectively, "Assumed Contracts"). "Contract" means any agreement, contract, consensual

obligation, promise, understanding, arrangement, commitment or undertaking of any nature (whether written or oral and whether express or implied), whether or not legally binding;

(viii)    <u>Marketing Materials</u>.  All marketing materials, telephone numbers used in the Business as listed on <u>Schedule 2.1(viii)</u>, and the right to receive and retain mail and other communications relating to the Business;

(ix)    <u>Resident Agreements</u>.  All contracts and agreements with residents of the Facility (the "<u>Resident Agreements</u>");

(x)    <u>Other Intangibles</u>. All customer relationships and goodwill, if any, used in, related to or arising in conjunction with the Business;

(xi)    <u>Permits</u>.   To the extent transferable, all permits use by Seller in the Business; and

(xii)    <u>Causes of Action</u>.   All rights, claims or causes of action of Seller or otherwise relating to the Business and the Assets.

2.2    <u>Excluded Assets</u>. Notwithstanding <u>Section 2.1</u> or anything else in this Agreement, the Assets shall not include, and Seller shall retain all of its right, title and interest in and to the following assets, which shall be referred to herein as "<u>Excluded Assets</u>": (i) the assets set forth on <u>Schedule 2.2(i)</u> of this Agreement, including, without limitation, cash in all bank accounts and any proceeds of the sale contemplated under this Agreement or the Purchase and Sale Agreement to which the Seller is entitled; (ii) the Contracts that are not Assumed Contracts (the "<u>Excluded Contracts</u>"); (iii) Seller's accounts receivable for services provided on or prior to the Closing; (iv) Seller's corporate books and records, voting securities and other similar books and records that Seller is required by law to retain, including tax returns, financial statements and corporate or other entity filings; provided, however, that Buyer will have the right, at its sole cost and expense, to make copies of any portions of such retained records that relate to the Business or any of the Assets; (v) all rights, claims, causes of action and credits to the extent relating to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of a Seller in respect of an Excluded Asset or Excluded Liability (including, without limitation, as they may relate to Seller's accounts receivable for services provided on or prior to the Closing); (vi) all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof (collectively, the "<u>Avoidance Actions</u>"); (vii) all postpetition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to Seller on a prepetition or postpetition basis (collectively, the "<u>Chapter 11 Deposits</u>") unless specifically provided for under an Assumed Contract, in which case it will be a Purchased Asset; (viii) all employee benefit plans and all trust funds and Contracts related thereto; (ix) all membership interests in and owned by Seller; (x) all potential rights, claims or causes of action (including any and all counter-claims) of Seller or the Seller's bankruptcy estates against Larkin Community Hospital, Inc., Hollywood Property Investments, LLC, Stabilis Fund II, LLC, Branch Banking and Trust Company or any other person or entity, including the receiver(s) appointed in the Foreclosure Action (as defined below), in connection with, arising out of,  or

relating to that certain loan made to Leonore Kallen and High Ridge Management Corp. or the enforcement and/or collection activities of such parties, whether subject of Case No.: 06-2-12-CA-26516 filed in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida (the "Foreclosure Action") or otherwise; and (xi) all rights, claims and causes of action that the bankruptcy estates have or may have against Seller's members, managers, shareholders, officers, directors, attorneys, accountants, or other professional advisors.

2.3    No Encumbrances. At Closing, the Assets shall be sold, assigned, transferred, conveyed and delivered to Buyer free and clear of any and all liens, pledges, hypothecations, charges, mortgages, security interests, claims (as defined in section 101(5) of the Bankruptcy Code (defined below)), causes of action, interest, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, preferences, rights of possession, leases, tenancies, licenses, demands, orders, options, rights of first refusal, preemptive rights, community property interests, reservations, conditions, obligations, liabilities and all other encumbrances of any kind or nature under Contract, at law or in equity, known of unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto (collectively, "Encumbrances"), except as may be specifically assumed by Buyer pursuant to the terms of this Agreement.

2.4    Non-Assignable Assets. Notwithstanding anything in this Agreement to the contrary, neither the execution of this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign or transfer to Buyer as "Assets" any asset of Seller which, by its terms or by applicable law, is not assignable without the consent of a third party thereto, or a governmental entity, or a novation thereof or is cancelable by a third party in the event of an assignment or transfer without such consent (a "Non-Assignable Asset"), unless and until such consent or novation is obtained. If any such consent or novation shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the proposed Asset such that Buyer would not, in effect, acquire the benefit of all such rights, then Seller, to the maximum extent permitted by law and the Asset, shall, after the Closing Date, act as the Buyer's agent in order to obtain for the Buyer the benefits thereunder. Unless and until such consent or novation is obtained, the Seller shall cooperate, to the maximum extent permitted by law and the applicable Asset, with each Buyer in any legal arrangement reasonably satisfactory to the Buyer and designed to provide the Buyer with all claims, rights and benefits to the Non-Assignable Asset and to relieve the Seller from any burden associated therewith.

2.5    Assumption of Liabilities by Buyer.

(i)    In consideration of the sale, transfer, assignment, conveyance and delivery of the Assets, and in reliance upon the representations and warranties made herein by Seller, Buyer shall undertake, assume, perform and otherwise pay, satisfy and discharge any and all liabilities and obligations of Seller arising out of or relating to the Business or the Assets on or after the Closing Date, other than the Excluded Liabilities (as defined in Section 2.5(ii)) (collectively, the "Assumed Liabilities"), including, without limitation, the following:

(a)    all liabilities and obligations arising following the Closing under or relating to any Assumed Contracts;

(b)      Obligations with respect to any employee, Service Provider, or agent of Seller relating to, arising out of, or in connection with their employment by or contract for service with Buyer after the Closing Date, including all rights and benefits under any contract, document, policy or understanding with any such employee, Service Provider or agent, all pension death benefit, retirement, medical, retiree, insurance, vacation, workers compensation and other liabilities and obligations with respect to such employee, Service Provider or agent;

(c)      all liabilities and obligations for (1) taxes relating to the Business, the Assets or the Assumed Liabilities for any period after the Closing Date, and (2) taxes for which Buyer is liable pursuant to, or as a result of, this Agreement; and

(d)      all other liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Business and the Assets after the Closing.

(ii)      With the exception of the Assumed Liabilities, Buyer shall not assume, and shall not be liable or obligated to pay or discharge any liabilities or obligations of Seller arising before the Closing Date or in connection with any of the Assets (collectively, the "Excluded Liabilities") for any of the following:

(a)      liabilities or obligations arising out of or relating to Seller's ownership or operation of the Business and the Purchased Assets prior to the Closing Date;

(b)      liabilities or obligations relating to or arising out of the Excluded Assets;

(c)      liabilities or obligations for (i) taxes relating to the Business, the Assets or the Assumed Liabilities for any taxable period prior to the Closing Date and (ii) any other taxes of Seller or any members or Affiliates of Seller (other than taxes allocated to Buyer under this Agreement) for any taxable period;

(d)      except as specifically provided herein, any liabilities or obligations of Seller relating to or arising out of (i) the employment, or termination of employment, of any employee prior to the Closing, or (ii) workers' compensation claims of any employee which relate to events occurring prior to the Closing Date;

(e)      any costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases;

(f)   liabilities of Seller under this Agreement;

(g)   liabilities arising out of or related to any legal proceeding or government investigation commenced, instituted or threatened against Seller or any officer, director, employee, predecessor or affiliate of Seller;

(h)   liabilities or obligations of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents (as defined in <u>Section 5.2</u>) and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others; and

(i)   Seller's liabilities with respect to any monetary defaults or other Cure Costs (as defined and described below) arising prior to the Closing Date under any of the Assumed Contracts.

**3.      <u>Cost Reports; Overpayments; Civil Monetary Penalties</u>.**

3.1      Seller shall cause final cost reports in respect to the operation of the Facility to be prepared and filed with the appropriate Medicare and Medicaid agencies as soon as practicable after the Closing Date, but in any event prior to the expiration of the period of time as may be required by law for the filing of each such final cost report under the applicable third party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to Buyer for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Seller's failure to timely file such final cost reports.

3.2      Each party hereto agrees to notify the other within five (5) business days after such party's receipt of any notice of any claim by AHCA, CMS, OIG or any other governmental or quasi governmental authority with respect to any of the following, relating to periods prior to the Closing: (i) an alleged Medicare or Medicaid overpayment, or any other recoupment or adjustment to reimbursement, (ii) an alleged underpayment of any bed tax, provider tax, or other tax or assessment or (iii) any other governmental or third-party payor claims (collectively "<u>Recapture Claim</u>").

3.3      <u>Intentionally deleted</u>.

3.4      Prior to the Closing, Seller shall use its best efforts (including, if applicable or necessary, requesting the state court receiver) to pay or (i) contest in good faith consistent with applicable appeal procedures, all outstanding Recapture Claims and any other fees and taxes due with respect to the Facility for periods prior to the Closing, and (ii) provide to Buyer, on or before the Closing, evidence reasonably satisfactory to Buyer of the foregoing payments or contest proceedings.  Seller shall also remain liable and responsible for the correction of all violations cited by AHCA or any other governmental authority in any survey prior to the Closing Date to the extent that correction of such violations is required and provided that Seller can perform or control the performance of such corrections (through contractors or suppliers of its choice that are reasonably acceptable to Buyer).  Notwithstanding the foregoing or anything to the contrary in this Agreement, Seller shall not be liable for any fines, fees or other amounts payable to any governmental authority (or an increase in any such amounts payable by Seller for conditions that existed prior to the Closing) arising out of or relating to Buyer's ownership or operation of the Business or the Assets from and after the Closing, including, without limitation,

as a result of the recurrence or continued existence of any condition that gave rise to such obligations of Seller before Closing.

3.5    Seller shall reasonably cooperate with Buyer to facilitate reasonable access to any Medicare and Medicaid cost reports for the Facility that have not been filed as of the Effective Date and underlying documentation for such reports.  Seller shall use commercially reasonable efforts to ensure that such reports are made available to Buyer for its review prior to the time such cost reports are filed.

## 4.    **Bankruptcy Court Matters**

4.1    <u>Bankruptcy Cases</u>.  On April 8, 2015, (the "<u>Petition Date</u>") Seller and Realty (as defined in the Purchase and Sale Agreement) filed voluntary petitions for reorganization relief (the "<u>Bankruptcy Cases</u>") with the United States Bankruptcy Court for the Southern District of Florida (the "<u>Bankruptcy Court</u>") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "<u>Bankruptcy Code</u>").

4.2    <u>Sale Motion</u>.  Seller has filed with the Bankruptcy Court on the Petition Date, a motion (the "<u>Sale Motion</u>") seeking the Bankruptcy Court's approval of (i) an order (the "<u>Bidding Procedures Order</u>") that, among other things, establishes procedures for an auction process to solicit competing bids and authorizes payment of the Breakup Fee (defined below) and the Expense Reimbursement (defined below), which Bidding Procedures Order was entered by the Bankruptcy Court, and (ii) an order (the "<u>Sale Order</u>") that, among other things, approves this Agreement, the Purchase and Sale Agreement, and the sale, transfer and assignment of the Assets and the Property (as defined in the Purchase and Sale Agreement) by Seller and Realty (as defined in the Purchase and Sale Agreement) to Buyer and Real Estate Buyer, respectively, pursuant to sections 105, 363 and 365 of the Bankruptcy Code.  The Sale Order must be in all material respects in form and substance reasonably acceptable to Buyer and Real Estate Buyer, in their reasonable discretion.  Seller shall file true, correct and complete copies of this Agreement and the Purchase and Sale Agreement with the Bankruptcy Court.

4.3    <u>Sale Order</u>.  Seller shall use reasonable best efforts to obtain entry of the Sale Order approving the transactions contemplated by this Agreement and the Purchase and Sale Agreement and granting, among other things, that (i) such sale, transfer and conveyance shall be, to the fullest extent permitted by the Bankruptcy Code and pursuant to Bankruptcy Code sections 105, 363(b) and 363(f), free and clear of all Encumbrances, other than the Assumed Liabilities, (ii) all Contracts (including the Provider Agreements, the Resident Agreements and the Larkin Lease (as defined in the Purchase and Sale Agreement)) required to be assumed by Seller or Realty and assigned to Buyer or Real Estate Buyer, as the case may be, are so assumed and assigned free and clear of all Encumbrances, other than the Assumed Liabilities, to the fullest extent permitted by Bankruptcy Code section 365, (iii) Buyer and Real Estate Buyer are deemed to have purchased the Assets and the Property, respectively, in good faith pursuant to Bankruptcy Code section 363(m), and (iv) Seller and Realty are authorized and directed to execute, upon request by Buyer and Real Estate Buyer, one or more assignments in form, substance and number reasonably acceptable to Buyer and Real Estate Buyer, evidencing the sale, transfer and conveyance of the Assets and the Property to Buyer and Real Estate Buyer, respectively, and/or their designees.

    4.4    <u>Assumption and Assignment</u>.

        (i)    Seller shall assume and assign to Buyer the Assumed Contracts, including the Provider Agreements and the Resident Agreements.  As required by 6.03(vii) of the Purchase and Sale Agreement, Realty shall assume and assign to Real Estate Buyer the Larkin Lease. Seller shall use reasonable best efforts to obtain entry of a Bankruptcy Court order (the "<u>Assumption Order</u>"), which Assumption Order may be the Sale Order, (i) authorizing, pursuant to Bankruptcy Code sections 105, 363 and 365, Seller to assume and assign to Buyer the Assumed Contracts, including the Provider Agreements, the Resident Agreements, (ii) authorizing, pursuant to Bankruptcy Code sections 105, 363 and 365, Realty to assume and assign to Real Estate Buyer the Larkin Lease, and (iii) fixing the amounts required by Bankruptcy Code section 365(b)(1) (the "<u>Cure Costs</u>").  Seller shall be responsible for all Cure Costs; provided, however, that Cure Costs are not applicable with respect to the Larkin Lease. Buyer or Real Estate Buyer, as applicable, and with the reasonable cooperation and assistance of Seller, will provide adequate assurance of future performance under each Assumed Contract. Seller shall not assume or reject any Contract without the prior written consent of Buyer.

    4.5    <u>Procedure</u>. Subject to its obligations as a debtor-in-possession, Seller shall promptly make any filings, take all actions and use reasonable best efforts to obtain all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Purchase and Sale Agreement.  Seller shall provide Buyer with drafts of all papers and proposed orders to be filed or submitted in connection with this Agreement for Buyer's prior review and comment and shall cooperate with Buyer to make reasonable changes thereto.  Seller agrees to diligently prosecute the entry of the Bidding Procedures Order, the Sale Order and the Assumption Order.  In the event the entry of the Bidding Procedures Order, the Sale Order and/or the Assumption Order is/are appealed, Seller shall use its reasonable best efforts to oppose such appeal(s).  Notwithstanding the foregoing, any resulting changes to this Agreement, the Bidding Procedures Order, the Sale Order or the Assumption Order shall be subject to Buyer's approval, in its reasonable discretion.

**5.**    **<u>Seller's Representations and Warranties</u>**. Except as otherwise set forth in the schedule of exceptions which shall be completed by the parties within thirty (30) days of the Effective Date and attached hereto (the "<u>Schedule of Exceptions</u>") (which exceptions set forth in the Schedule of Exceptions shall specifically identify the Section or Sections of this <u>Section 5</u> to which such exceptions relate and shall constitute exceptions to such identified Sections only), Seller hereby represents and warrants to Buyer, on the date hereof and as of the Closing Date, as follows:

    5.1    <u>Organization and Authority of Seller</u>. Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Florida, and, subject to approval by the Bankruptcy Court, has the corporate power to own its properties and Assets, conduct the Business as it is now being conducted, and consummate the transactions contemplated by this Agreement. Seller is not required to qualify to do business as a foreign corporation in any jurisdiction in which it is not so qualified.

5.2     <u>Enforceability; No Conflicts</u>. Subject to entry of the Bidding Procedures Order and the Sale Order and such other authorization required to be obtained by the Seller and Realty from Bankruptcy Court and the District Court, the execution and delivery of this Agreement and the agreements and instruments delivered in connection with this Agreement, including, without limitation, the Purchase and Sale Agreement (the "<u>Transaction Documents</u>"), and the performance of the transactions contemplated hereby and thereby, have been duly authorized and approved by all necessary corporate action of Seller, including but not limited to the adoption of the resolution set forth in <u>Schedule 5.2</u>. Seller has full corporate power to enter into and perform this Agreement, each Transaction Document and the transactions contemplated hereby and thereby. Assuming the due authorization, execution and delivery by the other parties hereto and the entry of the Bidding Procedures Order, the Sale Order and such other authorization required to be obtained by the Seller and Realty from the Bankruptcy Court, this Agreement and each Transaction Document constitutes the valid and binding agreement of Seller and are enforceable in accordance with each of their terms, subject to the effect of applicable bankruptcy, insolvency, reorganization or other similar laws affecting the rights of creditors and the effect, availability of rules of law governing specific performance, injunctive relief or other equitable remedies, and principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     <u>No Violation</u>. Except to the extent that the consent of certain Governmental Authorities is required to close the transactions contemplated by this Agreement and the other Transaction Documents, including, without limitation, the approval of the Bankruptcy Court, if applicable, the United States District Court for the Southern District of Florida (the "<u>District Court</u>") in connection with Case No. 12-23601 (the "<u>District Court Case</u>") and/or, to the extent applicable or required to obtain such Court's approval, the U.S. Department of Justice (the "<u>DOJ</u>") (collectively, "<u>Court Approval</u>"), and the approval of the change of ownership by AHCA, the execution and delivery of each Transaction Document by Seller, the performance by such parties of their respective obligations thereunder and the consummation by them of the transactions contemplated by the Transaction Documents will not (i) contravene any provision of Seller's Articles of Organization, any amendments thereto, Seller's operating agreement, any amendments thereto, or other organizational or governing document of Seller, (ii) violate or conflict with any Law (as defined below) or any arbitration award which is either applicable to, binding upon or enforceable against any such parties, or their property or assets (including the Assets), (iii) result in or require the creation or imposition of any Encumbrance upon or with respect to any of the properties or assets of any such parties, (iv) give to any individual or entity a right or claim against any such parties. "<u>Law</u>" means any provision of any foreign, federal, state or local law, statute, ordinance, charter, constitution, treaty, code, rule, regulation, decree, writ, injunction, judgment, order or guideline, including common law.

5.4     <u>Subsidiaries</u>. Seller does not own, directly or indirectly, any outstanding voting securities of or other interests in, nor does it control, any other corporation, partnership, limited liability company, joint venture or other entity.

5.5     <u>Title to and Condition of the Assets</u>.  Except as otherwise set forth on <u>Schedule 5.5</u>, Seller has good and marketable title to, and has the right to sell, assign, transfer, convey and deliver the Assets. The Assets are free and clear of all Encumbrances of any kind or nature

except for any liens or encumbrances permitted or disclosed hereunder or disclosed in or in connection with the Bankruptcy Cases. Subject to entry of the Sale Order, at the Closing, Buyer will be vested with good and valid title to such Assets, free and clear of all liens, claims and encumbrances other than as permitted hereunder, to the fullest extent permissible under Law, including Section 363 of the Bankruptcy Code.

    5.6    <u>Financial Statements and Liabilities of Seller</u>.

    (i)    Attached as <u>Schedule 5.6(i)</u> is a true and correct copy of Seller's (a) unaudited balance sheet as of July 31, 2014, together with the related statements of earnings, changes in financial conditions and shareholder's equity of Seller for the same period ("<u>Interim Balance Sheet</u>"), and (b) unaudited balance sheets and statements of income as of and for the fiscal years ended December 31, 2013 and December 31, 2012 for the Business (collectively with the Interim Balance Sheet the "<u>Financial Statements</u>"). Notwithstanding the foregoing, Buyer acknowledges that the Financial Statements were not prepared by Seller, and the representations provided with respect to the Financial Statements in this <u>Section 5.6</u> are made to the best of Seller's knowledge.

    (ii)    Except for payments owed to the mortgagee of the Real Property, any payments due to AHCA which will be paid at Closing out of the proceeds of this transaction, and as otherwise set forth on <u>Schedule 5.6(ii) or disclosed in or in connection with the Bankruptcy Cases or resulting from the Bankruptcy Cases</u>, to Seller's knowledge, Seller is not in default with respect to any liabilities or obligations shown or reflected in the Financial Statements, and such liabilities incurred or accrued subsequent to the date of the Financial Statements, have been, or are being paid and discharged by Seller as they become due, and all such liabilities and obligations were incurred in the ordinary course of business.

    (iii)    The Financial Statements are in accordance with the books and records of Seller.

    5.7    <u>Employees, Service Providers and Other Contractors</u>.

    (i)    At Closing, Seller shall use commercially reasonable efforts to provide Buyer with an updated list of (a) the names of all officers, directors, and employees of Seller, their respective title or position, present annual compensation (including bonuses, commissions and deferred compensation), and (b) individuals and advisors, excluding Service Providers (an initial copy of which has been provided to Buyer, who are currently performing services for Seller related to the Business who are classified as "consultants" or "independent contractors", which shall be attached as Schedule 5.7(i).

    (ii)    At Closing, Seller use commercially reasonable efforts to set forth on <u>Schedule 5.7(ii)</u> a list of (a) any guaranteed or other payments due to Service Providers, contractors or other agents; (b) bonuses, severance payments, termination pay and other special compensation of any kind paid to, or that would be payable to (as a result of this Agreement and/or Transaction Documents), any Service Provider or other contractor since the Interim Balance Sheet Date; and (c) increases in any Service Provider's wage or salary since the Interim

Execution Copy

Balance Sheet Date (provided that Seller shall use best efforts to ensure that no such increases shall be made other than in accordance with prior practice);

(iii)    At Closing, Seller will use commercially reasonable efforts to cause all of Seller's employees to be terminated, and Buyer will have no liability related to the employment or termination of such employees.

(iv)    As of the Receivership Date (as defined below) Seller did not have, and to Seller's knowledge, Seller has no collective bargaining agreements with any of its employees. To Seller's knowledge, there is no labor union organizing activity pending or, to the Seller's knowledge, threatened with respect to Seller.

(v)    Seller and its directors, officers, members, and senior management (other than the state court receiver and any CFO, CEO or other employees hired by the state court receiver) do not have any interest in or affiliation with any other skilled nursing facility in Florida (other than Hollywood Pavilion, LLC).

5.8    Licenses. To Seller's knowledge, Seller has all Licenses that are necessary for the conduct of the Business as presently conducted, including, without limitation, the Provider License and all licenses and permits required as a mental health hospital in the state of Florida. To Seller's knowledge, each of the Licenses are currently valid, binding, and in full force and effect.

5.9    Intellectual Property. Schedule 5.9 shall contain a true and complete list of all Intellectual Property, internet domain names and all web sites owned or operated by or on behalf of Seller. Seller has, and the Assets include, full legal right, title and interest in and to the Intellectual Property, internet domain names and web sites used in the conduct of the Business. The conduct of the Business of Seller, and the conduct and use of the Intellectual Property, to the knowledge of Seller, does not infringe or misappropriate any rights held or asserted by any person and, to the knowledge of Seller, no person is infringing on any Intellectual Property. None of the Intellectual Property is the subject of any pending or, to the knowledge of Seller, threatened action for opposition, cancellation, declaration, infringement, or invalidity, unenforceability or misappropriation or like proceeding.

5.10    Material Contracts. Section 5.10 of the Schedule of Exceptions shall set forth a complete list of all of Seller's Contracts, as of the Effective Date, whether or not made in the ordinary course of business, which are material to the operation of the Business (collectively, the "Material Contracts"). Except as set forth on Schedule 5.10, to Seller's knowledge all Material Contracts are in effect.

5.11    Real Property.  Seller leases the premises located at 1200 North 35th Ave., Hollywood, FL 33021, which Seller leases from High Ridge Management Corp. (the "Landlord").  Seller has not received any notice of any violation of any applicable deed restriction, building code, zoning ordinance, covenant, lease agreement, or other law or regulation with respect to the Premises.  No default or breach exists under any of the terms, covenants, conditions, or restrictions of its use of the Premises. Seller does not own any interest in real property.

5.12    Litigation. Except for the Bankruptcy Cases, the Foreclosure Case and as set forth on Schedule 5.12, and except for legal proceedings that do not have and could not reasonably be expected to have, individually or in the aggregate, a material adverse effect, as of the date hereof, there are no legal proceedings pending or, to Seller's knowledge, threatened against Seller that involve or relate to any of the transactions contemplated by this Agreement or affect any of the Assets or the Business or that could reasonably be expected to adversely affect Buyer's ownership of the Assets after the Closing.

5.13    Investigations.  Except as disclosed in Schedule 5.13, to Seller's knowledge, Seller is not the subject or target of any civil, criminal or administrative investigation or a defendant, respondent, or any of their equivalents in any federal, Florida or local investigation, criminal prosecution, civil complaint or administrative action.

5.14    Schedules; Updates prior to Closing.  The parties acknowledge and agree that, as of the date this Agreement is executed, the Schedules shall be in draft form.  However, Seller shall work in good faith to update and finalize each schedule as soon as possible, and shall further update all schedules prior to Closing.

5.15    Overpayments.  Except as set forth on Schedule 5.15, there are no pending, nor, to Seller's knowledge, threatened claims, demands or other notices of or action alleging the overpayment of Medicaid, Medicare or other governmental or quasi-governmental reimbursements or demanding the return of such alleged overpayments by any third party payor, nor is Seller aware of any grounds for such claim or demand.

5.16    Audits.  Seller agrees to fully cooperate with Buyer in connection with any audit by any applicable governmental regulatory agency in connection with any Medicaid or Medicare cost reports filed by Seller, including but not limited to providing Buyer with any and all necessary documentation, supporting schedules in its possession as reasonably requested by Buyer

5.17    Licensure.  The Facility is and shall on the Closing Date be licensed by AHCA as a 152 bed skilled care nursing home facility.  Such license is and shall on the Closing Date be in good standing and in full force and effect, without the requirement for any waiver and subject to no limitations.   Except for a notice received from AHCA and as otherwise set forth on Schedule 5.17, to Seller's knowledge, Seller has not received any written notice from any governmental agency requiring the correction of any condition with respect to such license which has not been the subject of a plan of correction for which compliance has been affected and Seller has no reason to believe that the good standing of any such license is in jeopardy.

5.18    Certification.  The Facility is, and shall be on the Closing Date, certified for participation in the Medicare and Medicaid reimbursement programs.  Such certification is and shall on the Closing Date be in good standing and full force and effect and subject to no restrictions or limitations.   Except as provided on Schedule 5.18, to the best of Seller's knowledge, Seller has not received any notice from AHCA, CMS or any other governmental agency requiring the correction of any condition with respect to such certification which has not

been the subject of a plan of correction for which compliance has been affected and Seller has no reason to believe that the good standing of such certification is in jeopardy.  Seller shall use its best efforts to reasonably promptly comply (or cause the state court receiver to comply) with any violation notices concerning the Facility received after the date hereof and before the Closing Date to the extent that any such notice requires compliance activities. In addition to, and not in any manner limiting the generality of, the foregoing, during the three-year period prior to the Closing Date, except as set forth in Schedule 5.18, to Seller's knowledge, Seller has not received any of the following with respect to the Facility:

1.    A notice of "immediate jeopardy" violations;

2.    A notice of termination of the license issued by AHCA to operate the Facility as a 152 bed skilled nursing facility;

3.    A notice of termination of the certification issued by AHCA or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

4.    A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs;

5.    a notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR § 488.430 et seq;

6.    a notice of denial of payment for new admissions to the Facility, or prohibition on acceptance of new admissions; or

7.    a notice that the Facility is being placed on the Special Focus Facility list.

5.19    Cost Reports.  To Seller's Knowledge, the receiver in the Foreclosure Action has filed, within the appropriate reporting period and with the appropriate authority, all cost reports required to be filed with respect to periods prior to the date hereof relating to the Facility, other than cost reports remaining to be filed pursuant to Section 3.1 hereof.

5.20    Life Care Contracts.  To the best of Seller's knowledge, the Facility is not a party to any life care contract with respect to any resident of the Facility, which would require ongoing care for such resident in return for a lump sum payment.

5.21    Personal Property and Residents.  Unless specifically permitted pursuant to the terms of this Agreement, Seller shall use commercially reasonable efforts to ensure that items of personal property are not removed from the Facility, and Seller shall not transfer residents from the Facility to a skilled/intermediate care nursing home facility owned or operated by an entity which is owned in whole or part, directly or indirectly, by the principals of Seller.  The information set forth in the admission agreements and patient rolls pertaining to residents of the Facility is true and correct in all material respects as of the respective dates of such admission agreements and patient rolls, and there are no patient care agreements with respect to any resident of the Facility which differs materially from the standard form used at the Facility.

5.22    Personal Needs Allowance.  To the best of Seller's knowledge, the Facility is currently in material compliance with all state and federal regulations relating to maintaining and accounting for the personal needs allowance ("PNA") for residents who request the establishment of a PNA account.  To Seller's knowledge, neither Seller nor the Facility has received any notice from any governmental authority citing or alleging any violation by Seller or the Facility of any state or federal PNA regulations.

5.23    Furniture.  To the best of Seller's knowledge, (i) there are at the Facility a number of beds equal to the maximum bed capacity as permitted under the Facility license; (ii)  each bed is in good repair and conforms with the minimum standards set forth under the regulations adopted by AHCA; and (iii) for each such bed, there exists the minimum furnishings, fixtures and other accessories required by AHCA.

5.24    Multi-Employer Plans.  As of the Receivership Date, Seller did not, and to Seller's knowledge, since the Receivership Date Seller does not, and is not required to, contribute (and has not ever contributed or been required to contribute) to any multi-employer plan, as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") with respect to the Current Employees.

5.25    Compliance with Applicable Laws.  Prior to the Receivership Date, the Facility was and, to the best of Seller's knowledge, since the Receivership Date, the Facility has been and is presently used and operated in material compliance with any applicable statute, law, regulation, rule, licensing requirement, ordinance, order or permit of any kind whatsoever affecting the Facility or any part thereof, and any rules or regulations promulgated thereunder, as well as any thereof relating to wages, hours, hiring, promotions, retirement, working conditions, nondiscrimination, health, safety, pensions and employee benefits, but not including any environmental laws.  In addition, no waivers have been obtained or are required to make the representations contained in this Section 5.25 fully true and correct.

5.26    No Additional Representations or Warranties. Except as set forth in this Section 5, Seller makes no representations or warranties to Buyer regarding the Assets or the Business, whether express or implied, and further expressly disclaims all such representations and warranties, including, without limitation, warranties of merchantability and/or fitness for a particular purpose.  Further, Buyer acknowledges and agrees that NEITHER SELLER'S COUNSEL NOR ANY OF SELLER'S OTHER PROFESSIONALS HAVE PREPARED ANY OF THE INFORMATION REGARDING SELLER OR REALTY, OR ANY OF THEIR RESPECTIVE OPERATIONS, ASSETS OR FINANCIAL CONDITION.  CONSEQUENTLY, NO REPRESENTATION IS MADE BY SELLER'S COUNSEL OR OTHER AGENTS REGARDING THE ACCURACY, RELIABILITY, VERACITY, ADEQUACY, OR COMPLETENESS OF ANY INFORMATION PROVIDED IN CONNECTION WITH THIS AGREEMENT, AND BUYER AND REAL ESTATE BUYER ARE ENCOURAGED TO CONSULT WITH THEIR OWN ADVISORS REGARDING ANY SUCH INFORMATION.

5.27    Knowledge of Seller.  The parties agree and acknowledge that a receiver has been present at and in control of the Facility, the Business and the Assets since approximately January 16, 2014 (the "Receivership Date"), and as such any provisions of this Agreement that are

limited to Seller's "knowledge" (or the best of Seller's knowledge or whether or not Seller has any "knowledge of" an event or circumstance) (a "<u>Knowledge Qualifier</u>") shall only mean the actual knowledge of Tamir Zury, Leonore Kallen, or any other member, shareholder, manager or director of Seller or Realty, and shall only be deemed subject to the Knowledge Qualifier for periods following the Receivership Date, and shall apply without any Knowledge Qualifier for periods prior to the Receivership Date. In addition, in the event Seller regains control of the facility from the receiver following the date hereof, then any Knowledge Qualifier hereunder shall not apply with respect to any periods following such date (the "Control Date") and the provisions hereof shall apply with respect to periods following the Control Date without any Knowledge Qualifier.

**6.**     **<u>Buyer's Representations and Warranties</u>**.  Buyer represents and warrants to Seller, as of the Effective Date and as of the Closing Date as follows:

6.1     <u>Authorization</u>. The execution and delivery of this Agreement and each Transaction Document, and the performance of the transactions contemplated hereby and thereby, have been duly authorized and approved by all necessary action of Buyer.  Buyer has full power to enter into and perform this Agreement and each Transaction Document and the transactions contemplated hereby and thereby. This Agreement and each Transaction Document constitutes a valid and binding agreement of Buyer enforceable in accordance with its terms (assuming the due authorization, execution and delivery by Seller and Bankruptcy Court approval and entry of the Sale Order), subject to the effect of applicable bankruptcy, insolvency, reorganization or other similar laws affecting the rights of creditors and the effect or availability of rules of law governing specific performance, injunctive relief or other equitable remedies.

6.2     <u>No Material Claim</u>. There is no material proceeding currently pending, or to Buyer's knowledge threatened, against Buyer which would prevent the consummation of the transactions contemplated by this Agreement or any Transaction Document, and Buyer does not know of any basis, grounds for, or threat of, any such proceeding.

6.3     <u>Examination</u>. Buyer and Buyer's representatives have received or been given access to all of the information described or referred to in this Agreement and all other information requested by them in respect of Seller. Buyer and its representatives have been afforded the opportunity to meet with, ask questions of and receive answers from the management of Seller regarding the Business and the Assets in connection with the determination by the Buyer to enter into this Agreement and consummate the transactions contemplated hereby.

6.4     <u>Sufficient Funds</u>.  Buyer has, on the date hereof and shall have as of the Closing Date, the financial capability to purchase the Assets on the terms and subject to the conditions set forth in this Agreement.

6.5     <u>Litigation</u>. As of the date hereof, there are no legal proceedings pending or, to the knowledge of Buyer, threatened against Buyer that involve or relate to any of the transactions contemplated by this Agreement.

**7.**    **Additional Covenants and Further Agreements**.

7.1    <u>Brokers and Consultants</u>.    Buyer and Seller each represent and warrant to the other that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not give rise to any valid claim against either for a finder's fee, brokerage commission, or other like payment, other than to Bayshore Partners, which shall be paid by Seller.

7.2    <u>Audits</u>.    Seller agrees to fully cooperate with Buyer in connection with any audit by any applicable governmental regulatory agency in connection with any Medicaid or Medicare cost reports filed by Seller, including but not limited to providing Buyer with any and all necessary documentation, supporting schedules in its possession as reasonably requested by Buyer

7.3    <u>Further Assurances</u>. The parties agree to execute and deliver or cause to be executed and delivered at the Closing, or at other reasonable times and places such additional instruments as the other party or its counsel may reasonably request for the purpose of carrying out this Agreement. Without limiting the generality of the foregoing, Seller shall cooperate with Buyer and take such actions as are necessary or expedient to (i) facilitate the process of the transfer of the Provider License and Provider Agreements, and (ii) cause all telephone numbers utilized by Seller in connection with the Business to be transferred to Buyer on the Closing Date.

7.4    <u>Indemnification of Buyer</u>. Subject to the limitations set forth in <u>Section 7.6</u>, Seller shall indemnify, defend and hold harmless Buyer, its managers, members officers, employees and agents (each, a "<u>Buyer Indemnified Party</u>") from and against any and all loss, liability, damage, cost or expense (including, but not limited to, reasonable legal fees and expenses) (collectively, the "<u>Losses</u>") which any Buyer Indemnified Party may incur or suffer that results from, relates to or arises out of (a) the inaccuracy of the Employment Expenses identified on <u>Schedule 8.2</u>, (b) the failure of Seller to comply with any covenants or other agreements made by Seller in this Agreement or any Transaction Document to the extent that such failure to comply materially adversely affects Buyer's title to the Assets, and (c) any other actual Losses actually and properly incurred by Buyer as a result of Seller's failure to properly provide notice to its creditors or otherwise comply with the procedures required by the Bankruptcy Court; provided, however, that Seller shall not be required to indemnify any Buyer Indemnified Party to the extent that of any Losses incurred as a result of the negligence or willful misconduct of any Buyer Indemnified Party, or for any amounts payable by Buyer pursuant to <u>Section 3.4</u>. Reasonably promptly after receipt by any Buyer Indemnified Party of any claim or action for which indemnification may be available under this <u>Section 7.4</u>, such Buyer Indemnified Party shall give written notice of such claim or action to Seller, but the failure to so notify Seller shall not relieve it of any liability, except to the extent Seller is actually prejudiced thereby. Seller shall assume the sole control of the defense of such claim or action, provided that the Buyer Indemnified Party may, at such Buyer Indemnified Party's sole cost and expense, engage counsel of its choosing to participate in such defense. No compromise or settlement of such claim or action may be effected by Seller without the Buyer Indemnified Party's prior written consent unless (i) there is no finding or admission of any violation of law by the Buyer Indemnified Party, or any violation of Buyer's rights to the Assets, and (ii) no Losses will be incurred by the Buyer Indemnified Party.

7.5    <u>Intentionally Deleted.</u>

7.6    <u>Limitations</u>.

(i)    Except for Seller's indemnification obligations, which shall survive until the first (1st) anniversary of the Closing Date, Seller's representations and warranties and obligations hereunder shall expire and be of no further force or effect on the Closing Date.

(ii)    No claim for indemnity by a Buyer Indemnified Party pursuant to Section 7.4 hereof shall be made unless and until the aggregate dollar amount of all such claims shall have exceeded $25,000.00 (in which case Seller shall be obligated to indemnify, defend and hold harmless each Buyer Indemnified Party for all Damages from the first dollar, including the initial $25,000.00). ("<u>Damages</u>" means losses, liabilities, damages, costs (including court costs and costs of appeal), taxes and expenses (including reasonable attorney's fees).

(iii)    The indemnification to which Buyer Indemnified Parties are entitled pursuant to Section 7.4 shall be subject to an aggregate ceiling equal to One Hundred Thousand Dollars (US $100,000.00), provided that the parties agree and acknowledge that Seller is in bankruptcy, and may not have assets following the Closing.

(iv)    <u>Intentionally deleted</u>.

(v)    <u>Intentionally deleted</u>.

(vi)    <u>Intentionally deleted</u>.

(vii)    NO PARTY SHALL BE RESPONSIBLE FOR OR HAVE ANY OBLIGATION TO INDEMNIFY, DEFEND OR HOLD HARMLESS THE OTHER PARTY OR ANY OTHER PERSON FOR SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES

7.7    <u>Access to Seller</u>.  From and after the Effective Date until the sooner to occur of the Closing Date or the termination of this Agreement, Seller shall use its best efforts to make appropriate arrangements to provide, Buyer and its representatives with access, at reasonable times, and upon reasonable prior notice, to the books, records, employees and property of Seller as Buyer reasonably requests to facilitate further investigation, inspection and analysis by Buyer of the Assets and Seller, its Business and prospects. Seller shall make available to Buyer (and its representatives) its attorneys, accountants and other outside consultants for the purpose of discussing the Business and the prospects of Seller.

7.8    <u>Provider Agreements</u>. For any periods following the Closing that Buyer is not yet able to bill Medicare and/or Medicaid, Seller shall allow Buyer to bill under Seller's provider number(s) (and any agreement(s) in connection therewith, to the extent so used by Seller), and Seller shall promptly forward to Buyer any payments received with respect thereto.

7.9    <u>Resident Trust Funds</u>.

(a)     Reasonably promptly after the Closing, Seller shall provide to Buyer a true, correct and complete accounting (properly reconciled) certified as being true, correct and complete by Seller's accountants or financial advisors of any patient trust funds and an inventory of all residents' property held by Seller on the Closing Date for patients at the Facility, a copy of which shall be attached hereto as Schedule 7.9. ("Patient Trust Funds and Property"), together with the funds and property shown on such accounting.

(b)     Seller will indemnify, defend and hold Buyer harmless from any and all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees: (i) in the event the amount of funds or any property, if any, transferred to Buyer did not represent the full amount of the funds and/or property delivered to Seller as of the Closing Date, (ii) with respect to any Patient Trust Funds and Property delivered, or claimed to have been delivered, to Seller, but which were not delivered by Seller to Buyer, or (iii) for claims which arise from actions or omissions of Seller with respect to the Patient Trust Funds and Property prior to the Closing Date; provided however that Seller shall be allowed a period of five (5) business days following receipt of written notice, to cure any of the foregoing prior to being required to indemnify.

(c)     Buyer will indemnify, defend and hold Seller harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Seller with respect to the Patient Trust Funds and Property where said funds were transferred to Buyer pursuant to the terms hereof, or for claims which arise from actions or omissions of Buyer after the Closing Date with respect to Patient Trust Funds and Property actually received by Buyer.

7.10    Access to Books and Records.   From and after the Closing Date, upon reasonable prior written notice from Seller, Buyer and Real Estate Buyer shall reasonably cooperate with Seller or Seller's successor and provide Seller or Seller's successor, at Seller's reasonable cost and expense, with free and full access to all books and records and other information related to the operation of the Facility and the Business prior to the Closing Date as Seller or Seller's successor or its respective counsel deem reasonably necessary or appropriate in connection with the investigation, defense, prosecution, or settlement of any claim, suit, demand, legal action, investigation, fine, charge, penalty or other proceeding, including, without limitation, all electronic and written communications, patient records, billing records, maintenance records, case files, marketing materials, contracts and other agreements, provided, however, that Seller, Seller's successor shall comply with all applicable state and federal Laws related to the privacy of any such information.

7.11    Conduct of Business.   Until the Closing, Seller shall use commercially reasonable efforts, except as otherwise restricted by the Bankruptcy Code or an order of the Bankruptcy Court, to operate the Business in the ordinary course of business.  Seller shall use commercially reasonable efforts to (A) preserve intact its business organization and goodwill, (B) maintain the Business and the Assets, (C) maintain satisfactory relationships with its suppliers, contractors, distributors, vendors and residents, (D) pay all of its post-petition obligations in the ordinary

course of business, and (E) continue to operate the Business in all material respect in compliance with all laws applicable to the Business and the Seller.

7.12    <u>Allocation of Purchase Price</u>.  Buyer, Seller and the Creditors Committee shall allocate the Purchase Price, as defined in the Purchase and Sale Agreement (together with Assumed Liabilities properly included, if any) among the Assets (and the real estate and other assets relating to the Facility and the subject of the Purchase and Sale Agreement) in a manner consistent set forth on Schedule 3.4 attached hereto.

7.13    <u>Cooperation and Audits</u>. Buyer and Seller will cooperate fully with each other regarding tax matters (including the execution of appropriate powers of attorney) and will make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such taxes.

## 8.    <u>Employees</u>.

8.1    Buyer shall determine, in its sole discretion, which of the Seller's employees shall be offered employment with Buyer after the Closing Date, pursuant to employment terms acceptable to Buyer (hereinafter, the "<u>Retained Employees</u>").   Nothing in this paragraph, however, shall create any right in favor of any person not a party hereto, including without limitation, the Current Employees, or constitute an employment agreement or condition of employment for any employee of Seller or any affiliate of Seller who is a Current Employee.

8.2    On the Closing Date, Seller shall provide Buyer with a credit (which credit shall be applied towards the Purchase Price paid pursuant to the Purchase and Sale Agreement) of an amount equal to all of the accrued (whether vested, unvested, contingent or mature) paid time off (which shall include all days for which Retained Employees are paid but do not actually work, such as sick days, vacation days, and holidays) and all other accrued but unpaid payroll obligations with respect to all Retained Employees, including but not limited to all FICA, withholding, unemployment, workmen's compensation or other employment related taxes in connection with the foregoing ("<u>Seller's Employment Expenses</u>").  Buyer expressly acknowledges that Buyer shall assume all post-closing obligations related to Seller's Employment Expenses with respect to all Retained Employees.  Seller shall use commercially reasonable efforts to provide Buyer with a schedule of Seller's Employment Expenses prior to Closing which shall be attached <u>hereto as Schedule 8.2</u>, and to update such schedule at Closing to reflect amounts outstanding at the Closing.  In the event that Buyer discovers after the Closing Date that the amount credited is less than the amounts required under this <u>Section 8.2</u>, Seller shall pay to Buyer, within ten (10) days after Buyer provides notice thereof, an amount equal to such deficiencies.

## 9.    <u>Accounts Receivable</u>.

9.1    If at any time after the Closing Date, Buyer shall receive any payment from any federal or state agency, which payment includes any reimbursement with respect to payments or underpayments made to Seller for services rendered prior to the Closing Date, then Buyer shall promptly remit such payments to Seller.  Buyer and Seller shall send copies of all Medicare and

Medicaid remittance advices to the other party for purposes of recording and pursuing accounts receivable for the period of twelve (12) months following the Closing Date and thereafter as reasonably requested by each party.  If at any time after the Closing Date, Seller shall receive any payment from any federal or state agency, which payment represents reimbursement with respect to payments or underpayments made to Buyer for services rendered on or after the Closing Date, then Seller shall remit such payments to Buyer.  Any such remittances pursuant to this <u>Section 9.1</u> shall occur within five (5) days from the date the party required to make such remittance receives payment thereof.  In connection with the foregoing, Buyer and Seller shall each, upon reasonable prior written notice from the other party, provide the other party or its representatives with access to books and records relating to such payments and services to permit such party verify payment of all amounts it is entitled to receive under this Section.

9.2    Any non-designated payments received by Buyer or Seller shall be applied to the services to which such payments relate, and shall be payable to Seller to the extent that services provided pre-Closing and payable to Buyer to the extent that such services were rendered by Buyer after the Closing).

## 10.    <u>Conditions to Closing</u>.

10.1    <u>Seller's Conditions to Closing</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions:

(i)    The representations and warranties of Buyer contained in this Agreement and in any exhibit or other Transaction Documents delivered pursuant hereto shall be true and correct on and as of the Closing Date;

(ii)    AHCA shall have approved the change of ownership of the Provider License that will result from the transactions contemplated under this Agreement ("<u>Licensure Transfer Approval</u>"), and each other Government Authority with jurisdiction over the transfer of Assets and the Business as contemplated herein shall have approved the transactions contemplated by this Agreement and each Transaction Document, to the extent applicable;

(iii)    The Bidding Procedures Order shall have been entered by the Bankruptcy Court, shall not have been modified, amended, rescinded or vacated in any respect and shall not be subject to a stay.

(iv)    The Sale Order shall have been entered by the Bankruptcy Court, shall not have been modified, amended, rescinded or vacated in any respect and shall not be subject to a stay;

(v)    The Provider Agreements, the Resident Agreements, the Larkin Lease and any other Contract designated by Buyer shall be assumed and assigned to Buyer or Real Estate Buyer by order of the Bankruptcy Court.

(vi)    Each agreement of Buyer to be performed on or before the Closing Date pursuant to the terms hereof or as contemplated herein shall have been duly performed;

(vii)    As and to the extent necessary, the United States District Court for the Southern District of Florida shall have approved the sale and transfer of the Assets pursuant to this Agreement in connection with Case No. 12-23601 and/or, to the extent applicable or required in connection to obtain the court's approval, the U.S. Department of Justice; Real Estate Buyer and Realty shall have entered into the Purchase and Sale Agreement and the closing of the transactions contemplated shall occur concurrently with the Closing; and

(viii)    Buyer shall have paid the Purchase Price pursuant to the Purchase and Sale Agreement and shall have delivered to Seller all of the Closing deliveries described in Section 11.2(ii) below and such deliveries and documents shall be acceptable in form and substance to Seller.

10.2    Buyer's Conditions to Closing. The obligations of Buyer at the Closing to consummate the transactions herein contemplated are subject to the fulfillment at or prior to the Closing of each of the following conditions:

(i)    The representations and warranties of Seller contained in this Agreement and in any exhibit or other Transaction Document delivered pursuant hereto shall be true and correct on, and as of, the Closing Date;

(ii)    Each agreement of Seller to be performed on or before the Closing Date pursuant to the terms hereof or as contemplated by this Agreement, including, without limitation, the obligations set forth in Section 7.7, shall have been duly performed;

(iii)    Buyer obtains, through its good faith efforts, Licensure Transfer Approval;

(iv)    Reserved.

(v)    The Bidding Procedures Order shall have been entered in form and substance reasonably acceptable to Buyer by the Bankruptcy Court, shall not have been modified, amended, rescinded or vacated in any respect and shall not be subject to a stay;

(vi)    The Sale Order shall have been entered in form and substance reasonably acceptable to Buyer by the Bankruptcy Court, shall include a waiver of the fourteen (14) day stay set forth in Federal Rule of Bankruptcy Procedure 6004(h), shall not have been modified, amended, rescinded, vacated, stayed or otherwise limited as to its terms or effectiveness and shall not be the subject of an appeal or motion for rehearing or new trial, provided however, that Buyer, in its sole and absolute discretion, may elect to proceed with the Closing even if an appeal from or a motion for rehearing or new trial on the Sale Order is pending;

(vii)    The Provider Agreements, the Resident Agreements, the Larkin Lease and any other Contract designated by Buyer shall be assumed and assigned to Buyer or Real Estate Buyer, as the case may be, by order (in form and substance reasonably acceptable to Buyer) of the Bankruptcy Court;

(viii)    As and to the extent necessary, the United States District Court for the Southern District of Florida shall have approved the sale of the Assets pursuant to this Agreement in connection with Case No. 12-23601 and/or, to the extent applicable or required in connection to obtain the court's approval, the U.S. Department of Justice;

(ix)    Buyer shall approve, in its reasonable discretion, any material and adverse update made by Seller to any informational schedules and exhibits hereto, between the Effective Date and the Closing date;

(x)    There shall not be at the Facility an open survey deficiency of the severity of "D" or worse; and

(xi)    Seller shall have delivered to Buyer all of the Closing deliveries described in <u>Section 11.2(i)</u> below.

## 11.    <u>Closing</u>.

11.1    <u>Closing; Manner of Closing</u>. The consummation of the transactions contemplated by this Agreement ("<u>Closing</u>") shall be concurrently with the closing pursuant to the Purchase and Sale Agreement (the "<u>Closing Date</u>"), subject to the closing conditions provided herein, either (i) at the offices of Seller's counsel; (ii) by exchange of documents via facsimile, PDF email, or nationally-recognized overnight courier; or (iii) at such other place and in such other manner as the parties may mutually agree.    <u>Sections</u> 5.00(a)-(b) of the Purchase and Sale Agreement (Closing) are incorporated herein by reference as if set forth at length herein.

11.2    <u>Closing Deliveries</u>.

(i)    At Closing, Seller shall deliver to Buyer the following:

(a)    a Bill of Sale in a form to be mutually agreed and attached hereto at Closing as <u>Exhibit A</u>;

(b)    a Closing Statement in a form to be mutually agreed (the "<u>Closing Statement</u>");

(c)    an Assignment with respect to intangible property, in a form to be mutually agreed and attached hereto at Closing as <u>Exhibit B</u> (the "<u>Assignment</u>");

(d)    a certificate of status for Seller dated not more than five (5) business days prior to the Closing Date issued by the Florida Secretary of State;

(e)    copies of actions of the members and managers of Seller approving this transaction;

(f)    any updates or modifications to the Schedules to this Agreement as necessary to reflect the operations of the Business from the execution of this Agreement to the Closing Date;

(g)       an assignment and assumption agreement with respect to all of Seller's rights and obligations under any Assumed Contracts; and

(h)       such other documents, consents and instruments as are necessary to convey the Assets to Buyer, and all other instruments and documents required to be delivered by Seller under this Agreement or which counsel for Buyer may reasonably request for the purpose of Closing the transaction contemplated by this Agreement.

(ii)     At Closing, Buyer shall deliver to Seller, all of which shall be subject to Seller's prior approval:

(a)       the Closing Statement;

(b)       Payment of the Purchase Price pursuant to the Purchase and Sale Agreement;

(c)       a countersigned copy of the Assignment; and,

(d)       such other documents and instruments required to be delivered by Buyer under this Agreement, or which counsel for Seller may reasonably request for the purpose of Closing the transaction contemplated by this Agreement.

## 12.    **Termination**.

12.1    <u>Termination by Seller</u>. Seller may terminate this Agreement at any time prior to the Closing Date if:

(i)      Buyer materially breaches any obligation or covenant to be performed by it pursuant to this Agreement or any Transaction Document, and such breach has not been cured within ten (10) business days following Buyer's receipt of written notice of such breach from Seller; or

(ii)     Any of the conditions to Seller's obligations set forth in <u>Section 10.1</u> have not been satisfied as of the Closing Date and Seller has not waived such condition in writing on or before the Closing Date; or

(iii)    Seller enters into or consummates an Alternative Transaction or Buyer is not determined to be the winning bidder at the Auction under the Bidding Procedures Order.

12.2    <u>Termination by Buyer</u>.  This Agreement is subject to termination at any time prior to the Closing Date by the Buyer if:

(i)      Seller materially breaches any obligation or covenant to be performed by it pursuant to this Agreement or any Transaction Document, and such breach has not been cured within ten (10) business days following Buyer's receipt of written notice of such breach from Buyer;

(ii)    Any of the conditions to Buyer's obligations set forth in <u>Section 10.2</u> have not been satisfied as of the Closing Date and Buyer has not waived such condition in writing on or before the Closing Date;

(iii)    <u>Intentionally deleted;</u>

(iv)    <u>Intentionally deleted;</u>

(v)    <u>Intentionally deleted;</u>

(vi)    The Sale Order, in all material respects in form and substance reasonably acceptable to Buyer and Real Estate Buyer, has not been entered by the Bankruptcy Court on or before July 1, 2015, unless extended by Buyer; or

(vii)    The Sale Order does not become final and non-appealable on or before July 15, 2015 unless waived by Buyer in its sole discretion.

(viii)    <u>Intentionally deleted;</u>

(ix)    Prior to the Closing Date, the Bankruptcy Cases are dismissed, converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee is appointed in the Bankruptcy Cases; or

(x)    Between the Effective Date and the Closing, any party with control over the day-to-day operation of the Facility, including a court-appointed receiver or Seller, as applicable, materially impairs Buyer's access, or refuses (i) to timely provide the Buyer and its agents reasonable access, upon reasonable notice during normal business hours, to the Facility and the personnel of the Facility, or (ii) grant Buyer and its agents reasonably prompt access to, or provide Buyer with, any materials and/or information relating to the Facility reasonably requested by the Buyer, Real Estate Buyer, and/or any of their lender(s), in connection with the Closing which materials and/or information are material to the Business and/or the Property; <u>provided</u>, <u>however</u>, that prior to exercising any right of termination pursuant to this <u>Section 12.2(x)</u>, Buyer shall provide Seller with written notice specifying the actions undertaken or materials not provided which constitute Buyer's claim of breach pursuant to this <u>Section 12.2(x)</u> in reasonable detail and providing Seller with five (5) business days to cure such breach; provided, further, that in the event that Seller disagrees that the events or circumstances alleged by Buyer are sufficient to constitute a claim for termination under this <u>Section 12.2(x)</u>, the parties agree to submit the matter to the Bankruptcy Court for expedited determination.

12.3    <u>Mutual Termination</u>. The parties may terminate this Agreement at any time prior to the Closing Date by mutual written consent.

12.4    <u>Failure To Close</u>. Either party may terminate this Agreement by giving the other party written notice at termination in the event that the Closing does not occur by September 1, 2015 through no fault of such party; provided that in such a case, the Deposit (as such term is defined and described in the Purchase and Sale Agreement) held pursuant to the Purchase and Sale Agreement shall be immediately returned to the Buyer thereunder.

12.5    <u>Effect of Termination</u>.    In the event that the Agreement is terminated in accordance with <u>Section 12.2</u>, this Agreement shall terminate and each party shall be relieved of its respective duties and obligations under this Agreement after the date of such termination; provided however, Seller shall be obligated to cause the Deposit to be immediately returned to Buyer.  If this Agreement is terminated in accordance with <u>Section 12.3</u> or <u>12.4</u>, this Agreement shall terminate and each party shall be relieved of its respective duties and obligations under this Agreement after the date of such termination and the Deposit shall be immediately returned to Buyer.  If this Agreement is terminated by Seller pursuant to <u>Section 12.1(a)</u>, each party shall be relieved of its respective duties and obligations under this Agreement after the date of such termination and Seller's sole remedy against Buyer shall be to retain the Deposit.

12.6    <u>Frustration of Closing Conditions</u>. No party may rely on the failure of any condition set forth in <u>Sections 12.1</u>, or <u>12.2</u>, as the case may be, if such failure was caused by such party's failure to comply with or breach of any provision of this Agreement.

**13.    <u>Name Change</u>.**  Within fourteen (14) days after the Closing, Seller shall take all steps necessary to effect a change in its corporate name to remove the words "Hollywood Hills" from such name.  Seller agrees that it shall (i) as soon as practicable after the Closing Date, and in any event within fourteen (14) days thereafter, cease to make any use of the name "Hollywood Hills Rehabilitation Center" or "Hollywood Hills Pavilion" or any service marks, trademarks, trade names, logos, symbols, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto, and (ii) immediately after the Closing cease to hold itself out as having any affiliation with the Business.

**14.    <u>Miscellaneous</u>.**

14.1    <u>Notices</u>. All notices, requests, consents, and other communications required or permitted under this Agreement shall be in writing (including electronic transmission) and shall be (as elected by the party giving such notice) hand delivered by messenger or courier service, electronically transmitted or mailed by first class mail (postage prepaid) addressed to:

| **If to Seller:** | **If to Buyer:** |
|---|---|
| Hollywood Hills<br>Rehabilitation Center, LLC<br>Attn: Tamir Zury<br>2421 NE 32 Court<br>Lighthouse Point, FL 33064<br>Fax:<br>Email: tzsabra@gmail.com | Hollywood Property Investments, LLC<br>Attn: Jack Michel, M.D., President & CEO<br>Administrative Offices5996 SW 70th Street.<br>5th Floor, South Miami, FL  33143 |

Execution Copy

*With a copy to*:

Perlman, Bajandas, Yevoli & Albright, P.L.
Attn: Mark Albright
200 South Andrews Ave., Suite 600
Fort Lauderdale, FL 33301
Fax: (954) 566-7117
Email: malbright@pbyalaw.com

-AND-

Markowitz Ringel Trusty + Hartog, P.A.
Attn: Grace E. Robson
101 NE Third Avenue, Suite 1210
Fort Lauderdale, FL 33301
Fax:  954.767.0035
Email: GRobson@mrthlaw.com

*With a copy to*:

Genovese Joblove & Battista, P.A.
Attn: Paul J. Battista
100 S.E. Second Street, 44th Floor
Miami, FL 33131
Fax: (304) 349-2310
Email: pbattista@gjb-law.com

*With a copy to*:

Kopelowitz Ostrow
Attn: Gary Matzner
2525 Ponce de Leon Blvd, Suite 625
Coral Gables, FL 33134
Matzner@KOlawyers.com

-AND-

Alan Perlman
Roetzel & Andress
350 Las Olas Boulevard
Las Olas Centre II Suite 1150
Fort Lauderdale, FL 33303-0310
Email:  Aperlman@ralaw.com

or such other address as any party may designate by notice complying with the terms of this Section. Each such notice shall be deemed delivered (a) on the date delivered if by hand delivery or by messenger or courier service; (b) on the date of transmission if by electronic transmission; and (c) two days after deposit with the United States Post Office, if mailed via first class mail.

14.2    Binding Effect. All of the terms and provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective legal representatives, successors and permitted assigns and designees, whether so expressed or not.

14.3    Counterparts; Facsimile and PDF Email Signatures. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original (including via facsimile or PDF email), but all of which together shall constitute one and the same instrument.

14.4    Enforcement Costs. If any civil proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees, court costs, sales and use taxes and all expenses even if not taxable as court costs (including, without limitation, all such fees, taxes, costs and

expenses incident to arbitration, appellate, bankruptcy and post-judgment proceedings), incurred in that proceeding, in addition to any other relief to which such party or parties may be entitled. Attorneys' fees shall include, without limitation, paralegal fees, investigative fees, administrative costs, sales and use taxes and all other charges billed by the attorney to the prevailing party (including any fees and costs associated with collecting such amounts).

14.5    Expenses. Except as otherwise provided in this Agreement, each of the parties shall bear and pay all direct costs and expenses incurred by it or on its behalf in connection with the transactions contemplated by this Agreement, including, without limitation, the fees and expenses of its own financial or other consultants, accountants, and counsel, which in the case of Seller, shall be paid (or, or fees that have been previously paid on Seller's behalf, reimbursed to the party(ies) making such payments) at Closing from the Purchase Price.

14.6    Interpretation. The headings preceding the text of Articles and Sections included in this Agreement and the headings to Schedules attached to this Agreement are for convenience only and shall not be deemed part of this Agreement or be given any effect in interpreting this Agreement. The use of the masculine, feminine or neuter gender or the singular or plural form of words herein shall not limit any provision of this Agreement. The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively. Reference to any Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually. Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof. Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect on the date hereof, including rules, regulations, enforcement procedures and any interpretations promulgated thereunder. Underscored references to Articles, Sections, clauses, Exhibits or Schedules shall refer to those portions of this Agreement, and any underscored references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs. The use of the terms "hereunder", "hereof", "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular Article, Section or clause of or Exhibit or Schedule to this Agreement.

14.7    No Waiver. No delay or omission by any party hereto to exercise any right or power occurring upon any noncompliance or default by any other party with respect to any of the terms of this Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver by any of the parties hereto of any of the covenants, conditions, or agreements to be performed by the other shall not be construed to be a waiver of any succeeding breach thereof or of any covenant, condition, or agreement herein contained.

14.8    Assignment. Seller shall not assign or transfer this Agreement or any of its rights or obligations incurred hereunder.  Subject to Seller's prior written consent which shall not be unreasonably withheld, Buyer shall have the right prior to Closing to assign this Agreement or its rights to receive all or part of the Assets and its obligations to assume all or any part of the

Assumed Liabilities, in each case, to one or more designees, provided that no such assignment shall relieve Buyer of any of its obligations hereunder.

14.9    Amendments. The provisions of this Agreement may not be amended, supplemented, waived or changed orally, but only by a written instrument specifically referencing this Agreement and signed by all parties.

14.10    Governing Law. This Agreement and all transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the state of Florida without regard to principles of conflicts of laws.

14.11    Jurisdiction and Venue. The parties acknowledge that a substantial portion of the negotiations, anticipated performance and execution of this Agreement occurred or shall occur in Broward County, Florida. ANY CIVIL ACTION OR LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT. EACH PARTY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT IN ANY SUCH CIVIL ACTION OR LEGAL PROCEEDING AND WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUCH CIVIL ACTION OR LEGAL PROCEEDING IN THE BANKRUPTCY COURT. Service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws, rules of procedure or local rules.

14.12    No Construction Against Draftsmen. The parties acknowledge that this is a negotiated agreement, and that in no event shall the terms of this Agreement be construed against any party on the basis that such party, or its counsel, drafted this Agreement.

14.13    Severability. If any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby. If any provision of this Agreement may be construed in two or more ways, one of which would render the provision invalid or otherwise voidable or unenforceable and another of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable.

14.14    Remedies Cumulative. Except as otherwise expressly provided in this Agreement, no remedy in this Agreement conferred upon any party is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right, power or remedy under this Agreement shall preclude any other or further exercise thereof.

14.15    Entire Agreement. This Agreement, all Exhibits and Schedules attached to this Agreement, represent the entire understanding and agreement between the parties with respect to the subject matter of this Agreement, and supersede all other negotiations, understandings and representations (if any), whether oral or written, made by and between such parties.

14.16   <u>Seller Disclosures</u>.    After notice to and consultation with Buyer, Seller shall be entitled to disclose, if required by applicable law or order of the Bankruptcy Court, this Agreement and all non-confidential information provided by Buyer in connection herewith to the Bankruptcy Court and any other party in interest in the Bankruptcy Cases.  Other than statements made in Bankruptcy Court or pleadings filed therein, Seller shall not issue any press release or make any public statement or public communication with respect to the Agreement or the transactions contemplated hereby without the prior written consent of Buyer, which consent shall not be unreasonably withheld.

14.17   <u>Bulk Sales Laws</u>.  To the greatest extent permitted by applicable law, Buyer and Seller hereby waive compliance with the terms of any bulk sales or similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, Buyer and Seller have executed this Agreement as of the date first set forth above.

BUYER:

SELLER:

**Hollywood Property Investments, LLC** a Florida limited liability company

**Hollywood Hills Rehabilitation Center**, a Florida limited liability company

By: _____

By: _____

Print Name: _Jack J. Michel_

Print Name: _____

Title: _Managing Member_

Title: _____

Signature Page to Asset Purchase Agreement

**IN WITNESS WHEREOF**, Buyer and Seller have executed this Agreement as of the date first set forth above.

**BUYER:**                                    **SELLER:**

**Hollywood Property Investments, LLC** a      **Hollywood Hills Rehabilitation Center**, a
Florida limited liability company              Florida limited liability company

By: _____         By: _____

Print Name: _____          Print Name: _____

Title: _____         Title: _____

Signature Page to Asset Purchase Agreement

**List of Exhibits and Schedules**

Exhibits:

|  |  |
|---|---|
| Exhibit A: | Bill of Sale |
| Exhibit B: | Assignment |

Schedules:

Schedules of Assets

| | |
|---|---|
| Schedule 2.1(iv) | Domain Names, Web Sites and software |
| Schedule 2.1(vii) | Assumed Contracts |
| Schedule 2.1(viii) | Marketing materials, telephone numbers |

Schedules of Excluded Assets

| | |
|---|---|
| Schedule 2.2(ii) | Excluded Contracts |

Schedules related to Purchase Price

| | |
|---|---|
| Schedule 3.3(c) | Payments to be Pro-rated |
| Schedule 3.4 | Allocation of Purchase Price |

Schedules related to Representations and Warranties

| | |
|---|---|
| Schedule 5.2 | Resolution of Seller |
| Schedule 5.5 | Title to Assets |
| Schedule 5.6(i) | Seller's Financial Statements |
| Schedule 5.6(ii) | Liabilities |
| Schedule 5.7(i) | Employees |
| Schedule 5.7(ii) | Guaranteed Payments |
| Schedule 5.9 | Intellectual Property |
| Schedule 5.10 | Material Contracts |
| Schedule 5.12 | Litigation |
| Schedule 5.13 | Investigations |
| Schedule 5.15 | Overpayments |
| Schedule 5.17 | Licensure |
| Schedule 5.18 | Certifications |

Schedules related to Additional Covenants and Further Agreements

| | |
|---|---|
| Schedule 7.9 | Patient Trust Funds and Property |
| Schedule 8.2 | Seller's Employment Expenses |

<u>Schedule 2.1 (iv)</u>

Domain Names, Web Sites and Software

1. Domain Names and websites:    http://www.hollywoodhillsrehab.com/

2. Software licenses:

   [The licenses below are pending confirmation from Receiver:]

   - MDI Achieve
   - ADP Payroll
   - Kronos
   - Quickbooks
   - Microsoft Office – Excel, Word, etc.

3. Website hosting contract with Inspired 2 Design, LLC

Schedule 2.1(vii)

Assumed Contracts

(*Note:  Pursuant to Section 4.4(i) of the Asset Purchase Agreement, the Buyer may designate additional Contracts to be assumed by Seller and assigned by Buyer. Accordingly, this list may be revised or amended as of the Closing Date)

| Party to Lease/Contract | Description of Lease/Contract |
|---|---|
| City of Hollywood Department of Public Utilities | Right of Way License Agreement. |
| Larkin Community Hospital, Inc. | Lease for use of real property. |
| AvMed, Inc. | Insurer/Provider contract. |
| CarePlus Health Plans, Inc. | Insurer/Provider contract. |
| Father M.F. Monahan Home Assoc. | Parking agreement. |
| Florida Medicaid/ACHA | Various agreements. |
| Humana, Inc. | Insurer/Provider contract. |

**Resident Agreements, including:**

(**Note: The residents identified below was based upon information provided on or about May 15, 2015. It is the Buyer's intention to assume all resident agreements, whether listed or not. The parties recognize that certain residents may be removed or added from the list and a final list shall be prepared to reflect the resident agreements in effect as of the Closing Date).

ALVES, CONCEPTA
ANDERSON, KESTANA
ARBER, RAQUEL
AVELLINO, MERCEDES N
BECKER, SONDRA               DEPENA, SONIA
BELL, ETHEL                  DEROSE, LINDA LEE
BERMUDEZ, CARMEN H           DESMANGLES, RICOT
BESU, ANA                    DOWLING, NORA
BIAMONTE, DOLORES            DOZORETS, LEON
BLAIR, MARGIE                DREPER, ISABEL
BOJARSKI, PAULINE            DUDELL, HELEN  STEIN
BRANYI, JOYCE                DUPLESSIS, ORDALINE
CABAL, FRANCISCO             EDGEHILL, SHEILA
CARNER, RICHARD              ELEZABY, MELEK
CAUSEY, ELIZABETH HAMNER     ERVING, RONALD EMORY
CHOEFF, BERNARD              ESCOBAR, MARIA
COHEN, BONNIE                FEINS, RITA
COOPER, CHRISTINE            FENELUS, ANNE M
CUNNINGHAM, MABELLE          FERRANS, WILLIAM

FERRETTI, LEONARD
FISCHBACH, IRENE
FRANCO, CECILIA
FRONTELA, ZOILA
FUNDEKLIAN, IDA
GAGNON, MILDRED
GARCIA, AURORA
GARRO, NORMA
GEFFRARD, LOUIS
GIORDANO, RONNIE
GISHKIN, BEATRICE
GOLDSTEIN, FLORENCE
GRANAWAY, MURIEL B
GRANGER, RAYMOND F
GRASSO, LOUIS
GREEN , CAROLYN LOU
GREEN, NEIL
GREENE, LEAH
HAUSER, ARLENE
HIDALGO, JORGE
HOLLANDER, MAUREEN
HUGHES, SULTANA
JAQUEZ, RAMIRA ANTONIA
JEAN BART, YVES
JEROME, MARIE
JOHNSON, MARJORIE
KERR, DONALD
KING, LOIS IRENE
KNOWLES, FRANCES A
KUCHINSKI, SOPHIE
LAMAS, CARMEN
LEE, LOIS
LEWIS, JOHN HENRY
LICHTERMAN, MARILYN
LINDENMAIER, MIRA
LINN, LORETTA
LUGO, NAYRA
LUONGO, MARY
MAISONET, PASCUAL
MARCIANO, MELAHAT
MARINO, MANUEL
MARTIN, ANNA
MASSAR, JENNIFER QUACH
MATOS, EUPILO A
MAZZACCO, MARY
MEADOWS JR., HOMER KYLE
MIA, HELENA V
MILLER, SUSAN

MONTERO, MARIA
MONTERO, ROLANDO I
MOORE, NANCY
MOSIER, MADELINE
MOULTRIE, BERNICE
NAVARRO, MOISES
NOVA, GAIL
OROZCO, MARIO
ORTIZ RIVERA, ESCOLASTICA
OSORIO, FILOMENA L
OWENS, BOBBY
PALMER, NETTIE
PAUL, YVONNE
PISTOIA, SYLVIA
REPCIK, ROSALIE
ROMANO, ALICE
ROSS, ASNEATH
ROUZIER, GERALD
RUSSO, MARIE
SCHULTZ, ADA
SEIDMAN, SIDNEY
SHOBE, VIRGINIA A
SIBOLE, ELLEN
SMAUL, FELIX
SMITH, RICKEY D
SMITH, WILLIE
STANISCIA, THERESA
STEELE, BETTY
TAGLE, OFELIA
TAYLOR, BEATRICE
TELLITO, SEREFINA
TROISE, TOSCA
VEZENDY, MARY
VILCHES, FLOR
WALDEN, MIMI TUBBS
WARNER, NATHANIEL
WEEKS, BARBARA HALLETZ
WELDON, BERNICE
WEST, CATHERINE
WILSON, VONDA
WINER, FERN
WRIGHT, VENETIA
YOUNG, WILLIAM IRA

Schedule 2.1(viii)

Marketing Materials and Telephone Numbers

1. Marketing Materials:  Website, brochures, advertisements, facebook, twitter, youtube, flickr, picassa

2. Telephone Numbers:
   954-981-5511
   800-247-1314

3. Fax Numbers:
   954-981-7729

4. Yellow Pages Listings: yelp.com, yellowpages.com

Schedule 2.2(i)

Excluded Assets (personal property, etc.)

1.    Cash in all bank accounts and any proceeds of the sale of the Purchase and Sale Agreement to which the Seller is entitled;

2.    Seller's accounts receivable for services provided on or prior to the Closing;

3.    Seller's corporate books and records, voting securities and other similar books and records that Seller is required by law to retain, including tax returns, financial statements and corporate or other entity filings; provided, however, that Buyer will have the right, at its sole cost and expense, to make copies of any portions of such retained records that relate to the Business or any of the Assets;

4.    all rights, claims, causes of action and credits to the extent relating to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of a Seller in respect of an Excluded Asset or Excluded Liability (including, without limitation, as they may relate to Seller's accounts receivable for services provided on or prior to the Closing);

5.    all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof (collectively, the "Avoidance Actions");

6.    all post petition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to Seller on a prepetition or postpetition basis (collectively, the "Chapter 11 Deposits") unless specifically provided for under an Assumed Contract, in which case it will be a Purchased Asset;

7.    all employee benefit plans and all trust funds and Contracts related thereto;

8.    all membership interests of, or owned by Seller;

9.    all potential rights, claims or causes of action (including any and all counter-claims) of Seller or the Seller's bankruptcy estates against Larkin Community Hospital, Inc., Hollywood Property Investments, LLC, Stabilis Fund II, LLC, Branch Banking and Trust Company or any other person or entity, including the receiver(s) appointed in the Foreclosure Action (as defined below), in connection with, arising out of, or relating to that certain loan made to Leonore Kallen and High Ridge Management Corp. or the enforcement and/or collection activities of such parties, whether subject of Case No.: 06-2-12-CA-26516 filed in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida (the "Foreclosure Action") or otherwise; and

10.   all rights, claims and causes of action that the bankruptcy estates have or may have against Seller's members, shareholders, officers, directors, attorneys, accountants, or other professional advisors.

Schedule 2.2(ii)
Excluded Contracts

| Party to Lease/Contract | Description of Lease/Contract | Proposed Cure Amount |
|---|---|---|
| **High Ridge Management Corp.** | | |
| Flatiron Capital | Insurance financing agreement. | Unknown |
| Graybar Financial Services | Capital Lease and Service Agreement for Avaya Phone System. | $8,871.28 |
| Leasing Associates / LAI Trust | Lease of two 2011 Ford E350 passenger vans. | Unknown |
| Total Renal Care, Inc. | Nursing Home Dialyses Transfer Agreement | Unknown |
| **Hollywood Hills Rehabilitation Center, LLC** | | |
| ADP, Inc. | Payroll processing services contract. | $0.00 |
| Airstron, Inc. | HVAC services contract. | $0.00 |
| AMC Medical Transportation | Resident transportation agreement. | $48.00 |
| American Eldercare, Inc. | Services contract for medical services and institutional care. | $1,591.57 |
| Curaspan Health Group, Inc. | Services contract for electronic data management. | $0.00 |
| Daimler Chrysler | Lease of 2011 Ford E250 and Ford E450. | $1,430.31 |
| Eccolab Group Co. | Laboratory services provider. | $6,055.29 |
| Eccolab Group Co. | Dishwasher lease agreement. | Unknown |
| Florida Natural Gas | Services agreement. | $816.85 |
| Hospice by the Sea, Inc. | Hospice services. | $1,463.70 |
| Hospice of Palm Beach County | Hospice services. | $0.00 |
| Kronos | | |
| MDI Achieve, Inc. | Service agreement | $0.00 |
| Medical Transportation Management, Corp. | Non-emergency medical transportation services. | $0.00 |
| Miami Dade College | Affiliation agreement. | $0.00 |
| Milner, Inc. | Copier/Printer lease. | $6,656.58 |
| Oasis Lawn, Inc. | Landscaping services contract. | $500.00 |
| Orkin, Inc. | Service agreement. | $717.10 |
| Paramount Automated Food Service | Service agreement. | $0.00 |
| Quality Care Rehab, Inc. | Therapy service contract. | $0.00 |
| Ravenswood Warehouses, Inc. | Storage unit leases. | $1,007.00 |

| Party to Lease/Contract | Description of Lease/Contract | Proposed Cure Amount |
|---|---|---|
| RXperts Pharmacy Services, Inc. | Pharmacy services contract. | $123,017.90 |
| Simplified Software Development, LLC | Diet management application subscription. | $0.00 |
| Stericycle, Inc. | Bio-medical/hazardous waste removal services. | $0.00 |
| Tallowmasters, LLC | Waste cooking oil removal service agreement. | $0.00 |
| Thyssen Miami Elevator | Service agreement. | $0.00 |
| Unishred Florida, LLC | Service agreement. | $95.00 |
| Vitas Health Corp. of Florida | Service agreement. | $44,733.52 |
| Vohra Health Services, P.A. | Service agreement. | $0.00 |
| Watertron, Inc. | Service agreement. | $183.00 |

<u>Schedule 5.2</u>

Exceptions to Authority and Resolutions of Seller

Seller's corporate power is subject to approval by the Bankruptcy Court, Court Approval, and the issuance of the Sale Order.

See Attached Resolutions of Seller .

<u>Schedule 5.5</u>

Title to Assets

1. Computers and printers are subject to the Milner Lease/Maintenance Contract

2. Phone system is subject to a secured lien held by Graybar Financial Services pursuant to a phone equipment lease

3. Mattress pressure guard is subject to a secured lien held by Gulf South Medical Supply

4. Potential lien by HPI (as defined on Schedule 5.6(ii)) on Assets, subject to discharge pursuant to the Sale Order.

Schedule 5.6(i)

Seller's Financial Statements

See confidential financial statements in the electronic data room established by Seller for review by potential bidders of its Confidential Information (the "Data Room"):

1. HHRC Bal Sheet as of December 2013

2. 201407 High Ridge Mgt FS

3. HHRC P&L July 2012 through June 2013

4. High Ridge Group 6-30-12 audited Financials

Schedule 5.6(ii)

Seller's Liabilities and Obligations

1.  Seller is one of several guarantors of a promissory note and mortgage issued in connection with a loan to Seller's parent, High Ridge Management Corp. ("High Ridge") in the original principal amount of up to $7,837,752.40.  Despite the fact that all payments under the promissory note and mortgage had been timely made, on December 5, 2013, Stabilis Fund II, LLC, the note holder at the time, filed a complaint, Case Number CACE-13-026516 against High Ridge, Seller, Leonore Kallen and the guarantors in the Circuit Court of the 17th Judicial Circuit in and For Broward County, Florida alleging that the note and mortgage were in default due to non-monetary defaults, which High Ridge, Leonore Kallen, Seller and the other guarantors dispute. Hollywood Property Investments, LLC ("HPI") currently holds the note and asserts it is owed at least $14.6 million. High Ridge and its affiliated debtors are removing the state court action to the Bankruptcy Court, as well as filing a complaint to determine the amount of the debt and extent of HPI's liens against the assets being sold.

2.  See Schedule D through Schedule F (pages 40 through 195 of the Schedules filed with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Schedules"), listing secured and unsecured creditors of Seller.

3.  See listing of Accounts Payable (pages 211-219 of the Bankruptcy Schedules).

5.  Phone system is subject to a secured lien held by Graybar Financial Services pursuant to a phone equipment lease.

6.  Potential compensation to employees for back wages or severance.


[To be updated by Received prior to Closing]

Schedule 5.7(i)

Seller's Employees and Agents

See list of employees and confidential payroll information in the Data Room:

1. Employee Listing

2. Payroll 1

3. Payroll 2

4. Payroll 3

5. Payroll 4

<u>Schedule 5.7(ii)</u>

Payments to Seller's Employees and Agents

Potential compensation to employees for back wages, paid time off, or severance.

<u>Schedule 5.9</u>

Intellectual Property

1. http://www.hollywoodhillsrehab.com/

2. Common law trademark in name Hollywood Hills Rehabilitation Center

Schedule 5.10

Contracts

The Provider Agreements, Resident Agreements (as defined in the APA), City of Hollywood Department of Public Utilities Right of Way License Agreement, as well as the Larkin Lease (as defined in the Real Estate Agreement) as reflected on the Amended Schedule G (pages 7 through 20 of the Amended Bankruptcy Schedules).

B6G (Official Form 6G) (12/07)

In re   **Hollywood Hills Rehabilitation Center, LLC**                              ,   Case No.   **15-16389**
                                                                      Debtor

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests. State nature of debtor's interest in contract, i.e., "Purchaser", "Agent", etc. State whether debtor is the lessor or lessee of a lease. Provide the names and complete mailing addresses of all other parties to each lease or contract described. If a minor child is a party to one of the leases or contracts, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

☐ Check this box if debtor has no executory contracts or unexpired leases.

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
| --- | --- |
| **ADP, Inc.**<br>**POB 9001006**<br>**Louisville, KY 40290-1006** | **Payroll processing services contract.** |
| **Airstron, Inc.**<br>**1559 SW 21st Avenue**<br>**Hollywood, FL 33023** | **HVAC Services Contract.** |
| **AMC Medical Transportation**<br>**6605 NW 74th Avenue**<br>**Miami, FL 33166** | **Resident Transportation Agreement** |
| **American Eldercare, Inc.**<br>**14565 Sims Road**<br>**Delray Beach, FL 33484** | **Services contract for medical services and institutional care.** |
| **AvMed, Inc.**<br>**9400 S. Dadeland Blvd.**<br>**Miami, FL 33156** | **Insurer/Provider Contract.** |
| **CarePlus Health Plans, Inc.**<br>**11430 NW 20th Street, Suite 300**<br>**Miami, FL 33172** | **Insurer/Provider Contract.** |
| **City of Hollywood, Florida**<br>**P.O. Box 229045**<br>**Hollywood, FL 33022** | **Right of Way License** |
| **Curaspan Health Group, Inc.**<br>**One Gateway Center**<br>**300 Washington Street, Suite 850**<br>**Newton, MA 02458** | **Services contract for electronic data management.** |
| **Daimler Chrysler**<br>**P.O. Box 5260**<br>**Carol Stream, IL 60197** | **2011 Ford E250 - 1FTNS2EW0BDA04344**<br>**2011 Ford E450 Cutaway - 1FDFE4FSXBDA24552** |
| **Eccolab Group Co.**<br>**8370 West Flagler Street, Suite 216**<br>**Hialeah, FL 33016** | **Laboratory services provider.** |
| **Eccolab Group Co.**<br>**8370 West Flagler Street, Suite 216**<br>**Hialeah, FL 33016** | **Dishwasher Lease Agreement** |

**3**
_____ continuation sheets attached to Schedule of Executory Contracts and Unexpired Leases

Best Case Bankruptcy

In re    **Hollywood Hills Rehabilitation Center, LLC**                                        ,          Case No.    **15-16389**
                                                                          Debtor

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES
(Continuation Sheet)

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| **Father M.F. Monahan Home Assoc.** **Knights of Columbus** **600 Knights Road** **Hollywood, FL 33021** | **Parking Agreement** |
| **Flatiron Capital** **1700 Lincoln Street., 12th Floor** **Denver, CO 80203** | **Insurance Financing Agreement** |
| **Florida Medicaid/ACHA** **2727 Mahan Drive** **Mail Stop #22** **Tallahassee, FL 32308** | **Various Agreements** |
| **Florida Natural Gas** **P.O. Box 78760** **Atlanta, GA 30357** | **Services Agreement** |
| **Graybar Financial Services** **11886 Lackland Road** **Saint Louis, MO 63146** | **Capital Lease and Service Agreements for Avaya Phone Systems** |
| **Hospice by the Sea, Inc.** **1531 West Palmetto Park Road** **Boca Raton, FL 33486** | **Hospice Services** |
| **Hospice of Palm Beach County** **5300 East Avenue** **West Palm Beach, FL 33407** | **Hospice Agreement** |
| **Humana, Inc.** **Humana Correspondence Office** **P.O. Box 14611** **Lexington, KY 40512** | **Insurer/Provider Contract.** |
| **MDI Achieve, Inc.** **10900 Hampshire Avenue South** **Suite 100** **Minneapolis, MN 55438** | **Service Agreement** |
| **Medical Transportation Management, Corp.** **d/b/a AMC Medical Transportation** **6605 NW 74th Avenue** **Miami, FL 33166** | **Non-emergency medical transportation services.** |
| **Miami Dade College** **950 NW 20th Street** **Miami, FL 33127** | **Affiliation Agreement** |
| **Milner, Inc.** **700 Military Trail** **Deerfield Beach, FL 33442** | **Copier/Printer Leases** |

Sheet   **1**   of   **3**   continuation sheets attached to the Schedule of Executory Contracts and Unexpired Leases

In re   **Hollywood Hills Rehabilitation Center, LLC**                                ,        Case No.    **15-16389**
                                          Debtor

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES
### (Continuation Sheet)

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| **Oasis Lawn, Inc.**<br>**P.O. Box 4054**<br>**Hollywood, FL 33083** | **Landscaping services contract.** |
| **Orkin, Inc.**<br>**3375 SW 3rd Avenue**<br>**Fort Lauderdale, FL 33315** | **Service Agreement** |
| **Paramount Automated Food Service**<br>**1421 SW 31st Avenue**<br>**Pompano Beach, FL 33069** | **Service Agreement** |
| **Quality Care Rehab, Inc.**<br>**8477 S. Suncoast Boulevard**<br>**Homosassa, FL 34446** | **Therapy services contract.** |
| **Ravenswood Warehouses, Inc.**<br>**5925 Ravenswood Road**<br>**Fort Lauderdale, FL 33312** | **Storage Unit Leases** |
| **RXPERTS PHARMACY SERVICES, INC.**<br>**4040 N. 29th Avenue**<br>**Hollywood, FL 33020** | **Pharmacy services contract.** |
| **Simplified Software Development, LLC**<br>**28050 US 19 North, Suite 509**<br>**Clearwater, FL 33761** | **Diet management application subscription.** |
| **Stericycle, Inc.**<br>**4010 Commercial Avenue**<br>**Northbrook, IL 60062** | **Bio-medical/hazardous waste removal services.** |
| **Tallowmasters, LLC**<br>**9401 NW 106th Street, #102**<br>**Miami, FL 33178** | **Waste cooking oil removal service agreement.** |
| **Thyssen Miami Elevator**<br>**2801 SW 15th Street**<br>**Pompano Beach, FL 33069** | **Service Agreement** |
| **Unishred Florida, LLC**<br>**P.O. Box 11369**<br>**Fort Lauderdale, FL 33334** | **Service Agreement** |
| **Vitas Healthcare Corp. of Florida**<br>**5420 NW 33rd Avenue, Suite 100**<br>**Fort Lauderdale, FL 33309** | **Service Agreement** |
| **Vohra Health Services, P.A.**<br>**3601 SW 160th Avenue**<br>**Suite 250**<br>**Hollywood, FL 33027** | **Service Agreement** |

Sheet    **2**    of    **3**    continuation sheets attached to the Schedule of Executory Contracts and Unexpired Leases

In re  **Hollywood Hills Rehabilitation Center, LLC**                    ,    Case No.    **15-16389**
                                    Debtor

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES
(Continuation Sheet)

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| **Watertron, Inc.**<br>**P.O. Box 640014**<br>**Miami, FL 33164** | **Service Agreement** |

Sheet    **3**    of    **3**    continuation sheets attached to the Schedule of Executory Contracts and Unexpired Leases

Schedule 5.12

Litigation

1.  Hollywood Property Investments, LLC v. v. High Ridge, Leonore Kallen, Seller *et. al.* (Case Number CACE-13-026516) filed in the 17th Circuit Court in and for Broward County, Florida - Pending.

2.  Dejean v. Hollywood Hills Rehabilitation Center, LLC, (Case Number 12-cv-60178-JIC) filed in the U.S. District Court Southern District of Florida (Fort Lauderdale).

3.  United States of America v. Karen Kallen-Zury (Seller and High Ridge as Intervenors), (Case Number 12-cv-23601-PCH) filed in the U.S. District Court Southern District of Florida (Miami) – Administratively Closed, but preliminary injunction remains in effect.

4.  Joseph Ippolito, et al. v. High Ridge Management Corp., et al. (Case No. 062004CA011803AXXXCE) filed in the 17th Circuit Court in and for Broward County, Florida – Pending.

5.  Vivian Gendernalik v. High Ridge Management Corp., et al. (Case No. 062008CA008140AXXXCE) filed in the 17th Circuit Court in and for Broward County, Florida – Pending.

6.  Darren Caruso v. High Ridge Management Corp., et al. (Case No. 062015CA002557AXXXCE) filed in the 17th Circuit Court in and for Broward County, Florida – Pending.

7.  High Ridge Management Corp. v. Cwg Healthcare Solutions, Inc. (Case No. 062004AP011809AXCCCE) filed in the 17th Circuit Court in and for Broward County, Florida – Pending.

8.  High Ridge Management Corp., et. al. v. Julius Baer, et al. (Case No. 062005CA016594AXXXCE) filed in the 17th Circuit Court in and for Broward County, Florida – Closed.

9.  United States of America, Ex. Rel. Jeffrey Hy. Byrd v. Hollywood Pavilion, LLC, d/b/a Hollywood Pavilion and High Ridge Management Corp. d/b/a/ Hollywood Hills Nursing Home, Inc. (Case No. 07-61424) filed under seal in the United States District Court Southern District of Florida (Miami) - Pending

Schedule 5.13

Investigations

1. Investigation and conviction of Karen Kallen-Zury related to the operation of the Seller's affiliate, Hollywood Pavilion, LLC for alleged Medicare fraud.

2. The Department of Justice (U.S. Attorney) investigation of Seller's affiliate Hollywood Pavilion is ongoing.

3. The Department of Justice (U.S. Attorney) also reviewed records of Seller.

<u>Schedule 5.15</u>

Overpayments

None to Seller's knowledge, but pending confirmation from Receiver prior to Closing.

<u>Schedule 5.17</u>

Licensure Notices

None other than as disclosed on Schedule 5.18.

[To be updated by Receiver prior to Closing]

Schedule 5.18

Medicare and Medicaid Certification Notices

1. Notice received from AHCA dated August 22, 2012

2. Notice received from AHCA dated June 19, 2013

3. Notices received from Centers for Medicare and Medicaid Services dated September 12, 2013, April 3, 2013, December 16, 2014 and January 8, 2015

4. Administrative Complaint filed by AHCA against Seller, AHCA No. 2014000953 dated February 14, 2014

5. See confidential files in Data Room:

   a.  AHCA Tags and Survey Dec 2014, response Jan 19, 2015

   b.  AHCA Survey items (1 to 26), 1 of 2, 20150202154524043

   c.  AHCA Survey items (28 to 31), 2 of 2, 20150202155540740

   d.  File entitled "ACHA Inspection_Details"


[To be updated by Receiver prior to Closing]

<u>Schedule 7.9</u>

Patients Trust Funds and Property

None pursuant to Schedule B, Item #2 (page 6) of the Bankruptcy Schedules.

[To be updated by Receiver and updated prior to Closing]

Schedule 8.2

Employment Expenses

See attached.

Note that information attached was based upon information provided on or about June 16, 2015

[To be updated by Receiver prior to Closing]

*Attachment after first page is intentionally omitted because contains personally identifiable and/or information that is private and personal with respect to employees.

Hollywood Hills Rehab Center, LLC
Position Code Master
Ending Pay Period 6/3/15-6/16/15

| Code | Full Description |
|------|------------------|
| 130 | Office Full Time |
| 131 | Office Part Time |
| 140 | Medical Records Full Time |
| 200 | Nursing Administration Full Time |
| 210 | Register Nurse (RN) Full Time |
| 211 | Register Nurse (RN) Part Time |
| 212 | Employee Transportation Full Time |
| 220 | LPN Full Time |
| 221 | LPN Part Time |
| 310 | CNA Full Time |
| 311 | CNA Part Time |
| 320 | Social Worker Full Time |
| 410 | MDS Full Time |
| 430 | Staffing/Central Supply Full Time |
| 510 | Environmental Svs. Full Time |
| 511 | Environmental Svs. Part Time |
| 520 | Laundry Full Time |
| 530 | Engineering Full & Part Time |
| 610 | Dietary  Full Time |
| 611 | Dietary  Part Time |
| 730 | Activities  Full Time |
| 731 | Activities  Part Time |
| 740 | CNA/Activities Full Time |
| 741 | CNA/Activities Part Time |

**EXHIBIT 2**

Execution Copy

## AGREEMENT FOR PURCHASE AND SALE

THIS AGREEMENT FOR PURCHASE AND SALE (this "Agreement") is entered into this 26th day of June 2015, by and between High Ridge Management Corp., Florida corporation ("Realty"), Hollywood Hills Rehabilitation Center, LLC, a Florida limited liability company ("Old Operator", and together with Realty, the "Seller") and Hollywood Property Investments, LLC, a Florida limited liability company and/or its permitted assigns ("Real Estate Buyer").

## RECITALS:

Realty is currently the owner of that certain property located in Broward County, Florida, containing approximately 1.85 acres located at 1200 N 35th Avenue, Hollywood, Florida, which is more particularly described as HOLLYWOOD HILLS 6-22 B LOTS 1 TO 12 BLK 45 and in Exhibit "A" attached hereto and made a party hereof ("Property"), and Old Operator is currently the licensed operator of Hollywood Rehabilitation Center, the 152 bed nursing home located on the Property.  The parties to this Agreement have agreed to the sale and purchase, pursuant to sections 105, 363 and 365 of the Bankruptcy Code (as defined in the Asset Purchase Agreement (defined below)), of the Property and related assets on the terms and conditions which are set forth in this document.  The effective date of this Agreement shall be the date upon which the last party to sign has executed this Agreement ("Effective Date").

In connection with the foregoing, Old Operator shall simultaneously with this agreement enter into that certain Asset Purchase Agreement with Hollywood Property Investments, LLC, a Florida limited liability company ("New Operator") of even date herewith (the "Asset Purchase Agreement"), relating to transition of operation of the Facility.

The transactions contemplated herein are subject to the approval of the Bankruptcy Court (as defined and described in the Asset Purchase Agreement) and will be consummated only pursuant to the Sale Order (as defined and described in the Asset Purchase Agreement) to be entered in the Bankruptcy Cases (as defined and described in the Asset Purchase Agreement).

## AGREEMENT:

**1.00   Purchase and Sale.**

Subject to all of the terms and conditions of this Agreement, Seller will sell to Real Estate Buyer and Real Estate Buyer will purchase from Seller (the "Purchased Assets"): (i) the Property, together with all appurtenances, rights, easements and rights of way incident thereto, (ii) all buildings and all other structures, facilities or improvements presently or hereafter located in or on the Land (the "Improvements"), including without limitation, that certain 152 bed nursing home facility commonly known as Hollywood Hills Rehabilitation Center (the "Facility"), and all other items of furniture, fixtures, equipment and any other personal property attached or appurtenant to, located on or used in connection with the ownership, use, operation or maintenance of the Improvements and/or the Facility (collectively, the "Personal Property"), other than the Supplies (as such term is defined in the Asset Purchase Agreement) which shall be transferred to New Operator pursuant to the Asset Purchase Agreement (iii) all right, title and interest, if any, of Seller in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof, (iv) all right, title and interest, if any, of Seller to any unpaid award for (1) any taking by condemnation or (2) any damage to the Land or the Improvements by reason of a change of grade of any street or highway, (v) all easements, licenses, rights and appurtenances relating to any of the foregoing, (vi) all intangible property of Seller; (vii) all of the goodwill symbolized and associated with the Facility, and (vii) any bed rights and other assets located at or used in connection with the Facility.

**1.01   Liabilities of Seller.**

Real Estate Buyer shall not assume and shall not be liable for, any debts, liabilities or obligations of Seller of any kind or nature, at any time existing or asserted, whether or not

Purchase and Sale Agreement

accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of this or any other transaction or event, including, but not limited to, any (i) liabilities or obligations of Seller to any of their creditors, shareholders or owners, (ii) liabilities or obligations of Seller with respect to any acts, events or transactions occurring prior to, on or after the Closing Date (as defined and described herein), or (iii) liabilities or obligations of Seller for any federal, state, county or local taxes applicable to or assessed against Seller or the assets or business of Seller. Unless specifically and unambiguously set forth herein to the contrary, Real Estate Buyer is not the successor to liability of Seller and is not herein assuming any liability arising from, out of, or relating to, Sellers' ownership or operation of the Purchased Assets.  Real Estate Buyer does not assume any payable of Seller, governmental claim or charge, malpractice, professional liability, resident rights violations, or violations of employee rights or  contracts, whether such claims arise in law, equity, in tort, contract, from statute, common law, or from any other source or precedent.

### 2.01    Purchase Price.

The purchase price to be paid by Real Estate Buyer to Seller for the Purchased Assets, including the assets being acquired under the Asset Purchase Agreement, is Twenty Four Million Six Hundred Thousand Dollars ($24,600,000.00) ("Purchase Price"), subject to prorations provided herein and payable as hereinafter described.

### 2.02    Deposit.

Upon the Effective Date of this Agreement, Real Estate Buyer has deposited with the law firm of Perlman, Bajandas, Yevoli & Albright, P.L., 200 South Andrews Avenue, Suite 600, Fort Lauderdale, Florida 33301 ("Escrow Agent") the sum of Nine Hundred Twenty-Five Thousand Dollars ($925,000.00) (the "Deposit").  The disposition of the Deposit shall be in accordance with the terms and conditions of this Agreement.

### 2.03    Payment of Purchase Price.

At the time of closing, Real Estate Buyer will pay to Seller by cashier's check or by wire transfer of funds the Purchase Price as adjusted for prorations, the deposits, applicable portions of extension fees and adjustments as set forth in this Agreement and less (i) the Deposit, (ii) a credit of Four Hundred Thousand Dollars ($400,000.00) against the actual amount of Buyer's allowed secured claim in accordance with 11 U.S.C. Section 506 as finally determined (whether pursuant to a final non-appealable order of the Bankruptcy Court (as defined in the Asset Purchase Agreement), by written agreement executed by Buyer and Seller, pursuant to a final judgment of a court of competent jurisdiction or otherwise), and (iii) a Credit Bid (as defined in section 363(k) of the Bankruptcy Code) of Real Estate Buyer, in an amount of Thirteen Million Nine Hundred Thousand Dollars ($13,900,000.00); provided however if it is agreed by the parties or determined by the Bankruptcy Court to be less than Thirteen Million Nine Hundred Thousand Dollars ($13,900,000.00), Real Estate Buyer will pay the difference in cash or immediately available funds. Upon closing, the Escrow Agent shall deliver the Deposit to an account designated by Realty (subject to Court Approval (as defined below). Real Estate Buyer's Credit Bid is without prejudice in any respect, including but not limited to, asserting a secured claim for a higher amount with regard to any sales proceeds.

### 2.04    Allocation.

The Purchase Price shall be allocated, as set forth in Exhibit "B" attached hereto, including, without limitation an allocation for the Property, Improvements, Facility, Personal Property and other components of the Purchase Assets.  Each party agrees (i) to complete jointly and file separately Form 8594 with its federal income tax return consistent with such allocation for the tax year in which the Closing (as defined and described herein) occurs, and (b) that no party shall take a position on any income, transfer, gains or other tax return, or before any federal, state or local governmental or quasi-governmental authority or in any judicial proceeding that is in any manner inconsistent with the terms of such agreed upon allocation.

Purchase and Sale Agreement                    2

**3.00    Title and Title Insurance.**

Seller, at Real Estate Buyer's expense, shall obtain a commitment ("Title Commitment") for an ALTA Form owner's title insurance policy issued by Chicago Title Insurance Company ("Title Company").    The title insurance commitment shall have a date subsequent to the Effective Date of this Agreement and shall show that title to the Property is good and marketable and insurable subject to no liens, encumbrances, exceptions or qualifications not accepted by Real Estate Buyer, in its sole discretion, in accordance with the terms of this Agreement.  Real Estate Buyer shall have ten (10) days from receipt of both the Title Commitment and Survey ("Title Review Period") in which to examine the condition of title and survey matters, including without limitation the legal compliance of the Property and its available parking with zoning and other legal requirements.  If Real Estate Buyer fails to provide Seller with written notice of specific defects to title and survey matters relating to the Property, other than as required by this paragraph to be cured by Seller, prior to the end of the Title Review Period, then, for all purposes of this Agreement, Real Estate Buyer shall be deemed to have accepted title in the condition described in the Title Commitment and as shown by the Survey.  Any title exceptions which are not objected to prior to the end of the Title Review Period shall be deemed to be permitted exceptions.  If Real Estate Buyer timely notifies Seller that title does not satisfy the requirements of this paragraph, then Seller agrees to use reasonable diligence to make title good, marketable and insurable, for which purpose Seller shall have a reasonable time but in no event more than sixty (60) days from the receipt of Real Estate Buyer's written notice that title is unacceptable.  After reasonable diligence on the part of Seller, if title is not rendered as required by this paragraph, then at the end of the sixty (60) day period, any money deposited by Real Estate Buyer, at the election of Real Estate Buyer, shall be returned to Real Estate Buyer, this Agreement shall be terminated and all parties hereto shall be released from any and all obligations and liabilities hereunder.  At any time prior to such termination, Real Estate Buyer may elect by written notice to Seller to waive any defects in title, in which event the closing shall take place pursuant to this Agreement without any abatement in price.  The obligation of Seller to cure title defects shall not include an obligation to expend money and pursue litigation, other than with respect to monetary liens which may be cured by a specified sum of money which shall be removed by Seller prior to the Closing, and for purposes of which Seller may utilize the Purchase Price.

**4.00    Reserved.**

**5.00    Closing.**

a.    Subject to the prior approval by the Bankruptcy Court (as defined in the Asset Purchase Agreement), the United States District Court for the Southern District of Florida in connection with Case No. 12-23601 (as and to the extent necessary) and/or, to the extent applicable or required to obtain Court Approval, the U.S. Department of Justice (the foregoing, collectively, the "Court Approval"), the closing ("Closing") of the purchase and sale contemplated by this Agreement shall be three (3) business days following satisfaction of all conditions to the Closing (the "Closing Date").  The Closing will be held at the offices of Escrow Agent or at such other place as the parties may mutually agree upon.

b.    Intentionally deleted.

c.    Real Estate Buyer's right to close this transaction is subject to New Operator closing on the purchase of the Assets in accordance with the terms and conditions of the certain Asset Purchase Agreement.

d.    Notwithstanding anything herein to the contrary, this Agreement may be terminated by mutual agreement of the parties, and shall automatically terminate upon the termination of the Asset Purchase Agreement in accordance with the terms thereof.  Sections 12.4 (Failure to Close) and 12.5 of the Asset Purchase Agreement (Effect of Termination) are specifically incorporated herein by reference as if set forth at length herein.

**6.00**     <u>Seller's Deliveries.</u>

Seller shall deliver to Real Estate Buyer at closing the following documents dated as of the closing date, the delivery and accuracy of which shall be a condition to Real Estate Buyer's obligation to consummate the purchase and sale;

       a.     <u>Special Warranty Deed.</u> A special warranty deed in recordable form, in the form to be attached hereto as Exhibit "C" within seven (7) days of the date hereof duly executed by Seller, conveying to Real Estate Buyer good, marketable and insurable fee simple title to the Property subject only to those exceptions contained in the Title Commitment, with the legal description provided in the Title Commitment.

       b.     <u>Bill of Sale.</u> A bill of sale, in the form to be attached hereto as Exhibit "D" within seven (7) days of the date hereof, duly executed and acknowledged by Seller (as applicable), sufficient to convey to Real Estate Buyer good and indefeasible title, free of all liens, encumbrances and security interests, in and to the Personal Property.

       c.     <u>General Assignment.</u> An assignment by Seller (as applicable), in substantially the form to be annexed hereto as Exhibit "E" within seven (7) days of the date hereof, of all of Seller's right, title and interest in, to any intangible property included in the Purchased Assets.

       d.     <u>Affidavit.</u> A no-lien, gap and exclusive possession affidavit in form and content customarily used in Broward County, Florida. The no-lien affidavit shall relate to any activity of Seller at the Property within the period that a mechanic's lien can be filed based on such activity prior to the closing.

       e.     <u>FIRPTA Affidavit.</u> In order to comply with the requirements of the Foreign Investment Real Property Tax Act of 1980 ("<u>FIRPTA</u>"), Seller will deliver to Real Estate Buyer at closing Seller's affidavit under penalty of perjury stating Seller is not a "foreign person," as defined in Section 1445 of the Internal Revenue Code of 1986 and the U.S. Treasury Regulations thereunder, setting forth Seller's taxpayer identification number, and that Seller intends to file a United States income tax return with respect to the transfer. Seller represents and warrants to Real Estate Buyer that it has not made nor does Seller have any knowledge of any transfer of the Property or any part thereof that is subject to any provisions of FIRPTA that has not been fully complied with by either transferor or transferee.

       As required by law, if Seller fails to comply with the requirement of this paragraph, Real Estate Buyer shall withhold ten percent (10%) of the Purchase Price in lieu of payment thereof to Seller and pay it over instead to the Internal Revenue Service in such form and manner as may be required by law.

       f.     <u>Seller's Certificate.</u> A duly executed certification that every warranty of Seller under this Agreement is true and correct in all material respects as of the closing as if made by Seller at such time.

       g.     <u>Shareholder Resolution.</u> Seller shall provide a duly executed shareholder resolution, authorizing the appropriate officer(s) of Seller to execute and deliver any of the above-listed documents on behalf of Seller. Additionally, Seller shall deliver to Real Estate Buyer current certificate of status for Seller issued by the Florida Secretary of State. Notwithstanding anything contained herein to the contrary, within five (5) days from the Effective Date hereof, Seller shall deliver to Real Estate Buyer a duly executed corporate resolution, authorizing the appropriate officers of Seller to, subject to Court Approval, execute, deliver and consummate the transaction contemplated herein.

       Seller shall also deliver to Real Estate Buyer and Real Estate Buyer's attorney, copies of all of the foregoing documents at least five (5) days prior to closing for Real Estate Buyer's review.

Purchase and Sale Agreement          4

**6.01    Real Estate Buyer's Deliveries.**

At the Closing, and after Seller has complied with all of the terms and conditions of this Agreement and simultaneously with Seller's delivery of the documents required in Paragraph 6.01, Real Estate Buyer shall pay to Seller by wire transfer of funds the Purchase Price, adjusted for the prorations, deposits, applicable portions of the extension fees and other payments provided for in this Agreement.

**6.02    Closing and Recording Costs.**

Seller shall pay the cost of documentary stamps to be affixed to the deed, surtax on the deed of conveyance, if any.  Real Estate Buyer shall pay for all recording costs (except the costs of recording corrective documents required pursuant to the terms of Paragraph 3.00 hereof, which costs shall be paid by Seller), all title related costs, including the cost of the owner's title insurance policy premium, and the cost of the Survey.  The closing and title agent shall be Perlman, Bajandas, Yevoli & Albright, P.L.

**6.03    Closing Conditions of Real Estate Buyer.**

Real Estate Buyer's obligation to consummate the transactions contemplated in this Agreement, pay the Purchase Price and accept title to the Purchased Assets shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of Real Estate Buyer or the waiver thereof by Real Estate Buyer, which waiver shall be binding upon Real Estate Buyer only to the extent made in writing and dated on or prior to the Closing Date.

(i)      Seller shall have performed and complied with all covenants and conditions required by this Agreement and the Asset Purchase Agreement to be performed or complied with by Seller.

(ii)     Possession of the Property shall be delivered to Real Estate Buyer free and clear of all liens, claims, encumbrances, tenancies and other occupancies and the Purchased Assets shall be delivered to Real Estate Buyer free and clear of any liens and Encumbrances (as defined in the Asset Purchase Agreement) except, to the extent applicable, for the tenancy of Larkin Community Hospital pursuant to the Larkin Lease (as defined below), any matters accepted by Real Estate Buyer in accordance with the terms hereof, and any occupancy rights of any patients and/or residents of the Facility.

(iii)    Old Operator and New Operator shall have entered into and consummated the transactions contemplated by the Asset Purchase Agreement.

(iv)     Reserved

(v)      As of the Closing Date, there shall have been no Material Adverse Change from the date hereof.  For purposes of this Agreement, "Material Adverse Change" means a material and adverse change in the condition of the Property, financial condition, results of operations, Purchased Assets or business of the Facility, the Facility's right to participate in Medicare or Medicaid, or claims for Recapture (as defined in the Asset Purchase Agreement) which will not be satisfied from the proceeds of the purchase price provided, however, that (a) changes due to general economic conditions not specifically affecting the Property, the Purchased Assets or the nursing home industry, and (b) any continued action ("Continued Action") by AHCA with respect to the nursing home license granted to Hollywood Hills Rehabilitation Center (to the extent AHCA approval of the Change in Ownership has been received, and New Operator's license is not materially and adversely effected by the Continued Action) shall not constitute a Material Adverse Change for purposes of this Section.

(vi)     The representations and warranties of Seller contained in this Agreement shall be true and complete as of the Closing Date and Seller shall be in full compliance

with the terms and provisions of this Agreement, in each case subject only to exceptions permitted by this Agreement.

        (vii)    There is a lease agreement entered into and in effect, between Seller (which shall be assigned to Real Estate Buyer at Closing pursuant to the terms and conditions of the Asset Purchase Agreement) and Larkin Community Hospital Behavioral Health Services, Inc., with respect to the operation of the psychiatric hospital in that portion of the Building specified therein (the "Larkin Lease").

        (viii)   Entry of the Sale Order as defined in Section 4.3 of the Asset Purchase Agreement.

**6.04**    **Closing Conditions of Seller**.    Seller's obligation to consummate the transactions contemplated in this Agreement shall be subject to:

        (i)    Real Estate Buyer shall have performed and complied with all covenants and conditions required by this Agreement and the Asset Purchase Agreement to be performed or complied with by Real Estate Buyer.

        (ii)    The Old Operator and New Operator shall have entered into and consummated the transactions contemplated by the Asset Purchase Agreement.

        (iii)    The transactions contemplated by this Agreement shall have received Court Approval.

**7.00**    **Taxes and Prorations.**

At the Closing, the taxes on the Property shall be prorated between the parties on the basis of the taxes paid for the most recent year that has been assessed and billed.  If the actual taxes for the year of Closing are not determinable at the closing date, then the parties agree to re-prorate taxes promptly upon issuance of the tax bill for the year of Closing.  All payments due prior to the Closing Date on certified special assessment liens shall be paid by Seller.  All payments due on or after the Closing Date on certified special assessment liens shall be paid by Real Estate Buyer, but prorated in accordance with the terms of this Paragraph 7 to the extent of any amounts relating to periods prior to the Closing.  Notwithstanding the foregoing, Seller's counsel or accountants shall collect and remit directly to the account of the I.R.S. where the transaction is properly reported the amount set forth on Schedule 7.2 of the Asset Purchase Agreement for taxes payable as a result of the transactions contemplated by this Agreement and the Asset Purchase Agreement.

In addition to the foregoing, Seller shall utilize funds with respect to the Purchase Price to pay any bed or provider taxes of Old Operator that are outstanding at the Closing.

**8.00**    **Possession.**

Real Estate Buyer shall be granted full possession of the Property as of the Closing, subject to the Larkin Lease and rights of residents of the Facility.

**9.00**    **Survey.**

During the Title Review Period, Seller, at Real Estate Buyer's expense, shall obtain a current survey of the Property ("Survey").  The Survey shall be certified to Real Estate Buyer, the institutional lending institution designated by Real Estate Buyer, if any, and the Title Company.  The Survey shall be prepared by a licensed Florida land surveyor in accordance with the minimum technical standards established by the Florida Board of Land Surveyors and shall be sufficient to cause the deletion from the Title Commitment matters which would be disclosed by an accurate survey.  The Survey shall contain a certification of the acreage contained within the Property and shall disclose all instruments of record as designated in the Title Commitment.  The Survey shall show that there are no encroachments on the Property.  Any encroachments

shown shall be treated as a title defect.  Real Estate Buyer shall notify Seller in writing of survey defects prior to the expiration of the Title Review Period.

**10.00    Seller's Warranties.**

Seller hereby warrants to Real Estate Buyer as follows:

a.    That Seller is vested with good and marketable fee simple title to the Property subject only to the permitted title exceptions as provided herein.

b.    There are no condemnation or eminent domain proceedings pending or to the best of Seller's knowledge contemplated against the Property or any part thereof, and Seller has received no notice of the desire of any public authority to take or use the Property or any part thereof.

c.    Except for the Bankruptcy Cases (as defined in the Asset Purchase Agreement), the foreclosure action maintained by Hollywood Property Investments, LLC or an affiliate thereof in connection with the mortgage on the Property, the Asset Purchase Agreement and Case No. 12-23601 filed in United States District Court for the Southern District of Florida, there are no pending suits or proceedings against or affecting Seller or any part of the Property which (i) do or could affect title to the Property or any part thereof; or (ii) do or could prohibit or make unlawful the consummation of the transaction contemplated by this Agreement, or render Seller unable to consummate the same.

d.    Seller and the party on behalf of Seller executing this Agreement has full power and authority to execute and deliver this Agreement and all documents now or hereafter to be delivered by it pursuant to this Agreement and to perform all obligations arising under this Agreement.

e.    Seller is a corporation duly organized and validly existing under the laws of the State of Florida and clear of all liens except for ad valorem taxes for the year of Closing, not yet due and payable, and for all subsequent years.

f.    Subject to the entry of the Sale Order, the Property at the time of Closing will be free and clear of all liens, claims and Encumbrances except for ad valorem taxes for the year of Closing, not yet due and payable, and for all subsequent years.

g.    No Seller has received any written notice from any insurance company which has issued a policy with respect to Purchased Assets or from any board of fire underwriters (or other body exercising similar functions) and governmental authority or any other third party, claiming any defects or deficiencies in Purchased Assets or suggesting or requesting the performance of any repairs, alterations or other work to the Purchased Assets. The Purchased Assets shall be delivered at the time of the Closing in the same condition as they are in on the date hereof, reasonable wear and tear excepted.

At the Closing, Seller shall, in writing, reaffirm to Real Estate Buyer the truth and correctness, as of the Closing Date, of each of the warranties and, subject to the limitations on the duration and amount of Seller's indemnification obligations set forth in the Asset Purchase Agreement, agrees to indemnify and hold Real Estate Buyer harmless from any loss or damage suffered by Real Estate Buyer on account of the untruth or incorrectness of any such warranties.

AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, SELLER AND REAL ESTATE BUYER AGREE THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT AND ANY OTHER APPLICABLE PROVISIONS OF THIS AGREEMENT (TO THE EXTENT SUCH WARRANTIES SURVIVE CLOSING FOR THE PERIOD OF THEIR SURVIVAL) AND IN THE CLOSING DOCUMENTS, REAL ESTATE BUYER IS ACQUIRING THE PROPERTY "AS IS" WITH ALL FAULTS AND DEFECTS, LATENT AND PATENT, AND REAL ESTATE BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE

Purchase and Sale Agreement                7

REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT AND IN THE CLOSING DOCUMENTS, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL, AND GEOLOGY, OR THE PRESENCE OR ABSENCE OF ANY POLLUTANT, HAZARDOUS WASTE, GAS OR SUBSTANCE OR SOLID WASTE ON OR ABOUT THE PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY INTEND TO CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY GOVERNMENTAL AUTHORITY OR BODY HAVING JURISDICTION INCLUDING, WITHOUT LIMITATION, ALL APPLICABLE ZONING LAWS, (E) THE HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) ANY VESTED RIGHTS FOR THE DEVELOPMENT OR USE OF THE PROPERTY, OR (G) ANY OTHER MATTER RELATED TO OR CONCERNING THE PROPERTY.  REAL ESTATE BUYER SHALL NOT SEEK RECOURSE AGAINST SELLER ON ACCOUNT OF ANY LOSS, COST OR EXPENSE SUFFERED OR INCURRED BY REAL ESTATE BUYER WITH REGARD TO ANY OF THE MATTERS DESCRIBED IN CLAUSES (A) THROUGH (F) ABOVE AND HEREBY ASSUMES THE RISK OF ANY ADVERSE MATTERS RELATED TO THE MATTERS DESCRIBED IN CLAUSES (A) THROUGH (F) ABOVE.  REAL ESTATE BUYER ACKNOWLEDGES THAT REAL ESTATE BUYER, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY OR ON BEHALF OF SELLER OR ANY STATEMENT, REPRESENTATION OR OTHER ASSERTION MADE BY SELLER WITH RESPECT TO THE PROPERTY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT (TO THE EXTENT SUCH WARRANTIES SURVIVE CLOSING FOR THE PERIOD OF THEIR SURVIVAL) AND IN THE CLOSING DOCUMENTS.  REAL ESTATE BUYER FURTHER ACKNOWLEDGES THAT NO INDEPENDENT INVESTIGATION OR VERIFICATION HAS BEEN OR WILL BE MADE BY SELLER WITH RESPECT TO ANY INFORMATION SUPPLIED BY OR ON BEHALF OF SELLER CONCERNING THE PROPERTY, AND SELLER MAKES NO REPRESENTATION AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION, IT BEING INTENDED BY THE PARTIES THAT REAL ESTATE BUYER SHALL VERIFY THE ACCURACY AND COMPLETENESS OF SUCH INFORMATION ITSELF.  REAL ESTATE BUYER ACKNOWLEDGES THAT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS SECTION ARE AN INTEGRAL PORTION OF THIS AGREEMENT AND THAT SELLER WOULD NOT AGREE TO SELL THE PROPERTY TO REAL ESTATE BUYER FOR THE PURCHASE PRICE WITHOUT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS SECTION.

**11.00   Covenants of Seller.**

Seller hereby covenants with Real Estate Buyer as follows:

a.      Between the date of this Agreement and the Closing, Seller will not, without Real Estate Buyer's prior written consent, create by its consent any encumbrances on the Property.  For purposes of this provision the term "encumbrances" shall mean any liens, claims, options, mortgages or other encumbrances, encroachments, right-of-way, leases, easements, covenants, conditions or restrictions.

b.      Between the date of this Agreement and the Closing Date, Seller will not file any application for any change of the present zoning classification of the Property unless such change is requested by Real Estate Buyer.

**12.00   Jury Waiver.**  SELLER AND REAL ESTATE BUYER HEREBY MUTUALLY KNOWINGLY, WILLINGLY AND VOLUNTARILY WAIVE THE RIGHT TO TRIAL BY JURY, AND NO PARTY NOR ANY ASSIGNEE, SUCCESSOR, HEIR OR LEGAL REPRESENTATIVE OF THE PARTIES (ALL OF WHOM ARE HEREINAFTER REFERRED TO AS THE "PARTIES") SHALL SEEK A JURY TRIAL ON ANY LAWSUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEEDING BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED THERETO, OR ANY COURSE OF ACTION, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS RELATING TO THIS TRANSACTION.  THE PARTIES ALSO WAIVE ANY RIGHT TO CONSOLIDATE ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN WAIVED.  THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY NEGOTIATED BY THE PARTIES.  THE WAIVER CONTAINED HEREIN IS IRREVOCABLE, CONSTITUTES A KNOWING AND VOLUNTARY WAIVER AND SHALL BE SUBJECT TO NO EXCEPTION. SELLER HAS IN NO WAY AGREED WITH OR REPRESENTED TO REAL ESTATE BUYER OR ANY OTHER PARTY THAT THE PROVISIONS OF THIS PARAGRAPH WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.  THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**13.00   Real Estate Commissions.**

Seller and Real Estate Buyer hereby warrant to each other that there are no brokers with respect to the purchase and sale of the Property as contemplated by this Agreement, except for Bayshore Partners, which shall be the sole responsibility of Seller.  Each party shall indemnify and hold the other party harmless against any and all liability, cost, damage and expense (including, but not limited to, attorneys' fees and costs of litigation and appeals) the indemnified party shall ever suffer or incur because of any claim by any broker or agent claiming to have dealt with the non-indemnified party, whether or not meritorious, for any commission or other compensation with respect to this Agreement or to the purchase and sale of the Property in accordance with this Agreement.

**14.00   Condemnation.**

In the event of the institution against the record owner of the Property of any proceedings, judicial, administrative or otherwise, relating to the taking, or to a proposed taking of any portion of the Property by eminent domain, condemnation or otherwise (which materially impairs the proposed development of the Property), prior to Closing, or in the event of the taking of any portion of the Property by eminent domain, condemnation or otherwise, prior to Closing, then Seller shall notify Real Estate Buyer promptly and Real Estate Buyer shall have the option, in its sole and absolute discretion of either (i) terminating this Agreement and obtaining a full refund of the Deposit; or (ii) Closing in accordance with the terms of this Agreement, but at such Closing Seller shall assign to Real Estate Buyer all of its right, title and interest in and to any net awards that have been or may be made with respect to such eminent domain proceeding or condemnation.  Such election must be made by Real Estate Buyer within thirty (30) days of the notice furnished by Seller.  If Real Estate Buyer fails to make an election in writing, he shall be deemed to have elected alternative (i).

**14.01  Casualty.**

In the event of a casualty with respect to the Purchased Assets, prior to Closing, then Seller shall notify Real Estate Buyer promptly and Real Estate Buyer shall have the option, in its sole and absolute discretion of either (i) terminating this Agreement and obtaining a full refund of the Deposit; or (ii) Closing in accordance with the terms of this Agreement, but at such Closing Seller shall assign to Real Estate Buyer all of its right, title and interest in and to any insurance awards that have been or may be made with respect to such casualty and the Purchase Price shall be reduced by any deductible in connection therewith.  Such election must be made by Real Estate Buyer within thirty (30) days of the notice furnished by Seller.  If Real Estate Buyer fails to make an election in writing, he shall be deemed to have elected alternative (i).

**15.00  Default; AHCA**

If this transaction does not close solely due to a refusal or default on the part of Real Estate Buyer, then any deposits placed under this Agreement shall be delivered by the Escrow Agent to Seller as liquidated and agreed upon damages and which shall be Seller's sole recourse as against Real Estate Buyer; and thereafter, Real Estate Buyer shall be relieved from all further obligations under this Agreement and Seller shall have no further claim against Real Estate Buyer for specific performance or for damages by reason of the failure of Real Estate Buyer to close this transaction.

If this transaction fails to close due to either (i) a default on the part of Seller, or (ii) failure of Real Estate Buyer's Closing conditions pursuant to Section 6.03 to be satisfied through no fault or delay of Real Estate Buyer or New Operator, then at the option of Real Estate Buyer, any deposits and extension payments placed under this Agreement shall be immediately returned by the Escrow Agent to Real Estate Buyer, together with all interest earned thereon, provided however, that in the event of a breach of default hereunder by Seller such return shall not limit Real Estate Buyer's right to maintain an action for Seller's breach of this Agreement, whether by way of damages or specific performance or any other relief whatsoever.

In the event AHCA requires corrective action with respect to the Facility, as a condition to approval of New Operator's licensure, Seller shall not be obligated for any expense of such corrective action.

**16.00  Escrow.**

Any Escrow Agent receiving funds is authorized and agrees by acceptance thereof to promptly deposit and to hold same in escrow and to disburse same subject to clearance thereof in accordance with terms and conditions of this Agreement.  Failure of clearance of funds shall not excuse performance by Real Estate Buyer.  In the event of doubt as to its duties or liabilities under the provisions of this Agreement, the Escrow Agent may, in its sole discretion, continue to hold the monies which are the subject of this escrow until the parties mutually agree to the disbursement thereof, or until a judgment of a court of competent jurisdiction shall determine the rights of the parties thereto, or it may deposit all the monies then held pursuant to this Agreement with the Clerk of the Bankruptcy Court, and upon notifying all parties concerned of such action, all liability on the part of the Escrow Agent shall fully terminate, except to the extent of accounting for any monies theretofore delivered out of escrow.  In the event of any suit between Real Estate Buyer and Seller wherein the Escrow Agent is made a party by virtue of acting as such Escrow Agent hereunder, or in the event of any suit wherein Escrow Agent interpleads the subject matter of this escrow, the Escrow Agent shall be entitled to recover a reasonable attorney's fee and costs incurred, said fees and costs to be charged and assessed as court cost in favor of the prevailing party.  All parties agree that the Escrow Agent shall not be liable to any party or person for drawing upon a letter of credit, if any, delivered in accordance with the terms of this Agreement, notwithstanding any subsequent notice or communication received by Escrow Agent to the contrary.  All parties further agree that the Escrow Agent shall not be liable to any party or person whomsoever for misdelivery to Real Estate Buyer or Seller of monies subject to this escrow, unless such misdelivery shall be due to willful breach of this Agreement or gross negligence on the part of the Escrow Agent.  Seller and Real Estate Buyer agree that the status of

Purchase and Sale Agreement                    10

Seller's counsel as Escrow Agent under this Agreement does not disqualify such law firm from representing Real Estate Buyer in connection with this transaction and in any disputes that may arise between Seller and Real Estate Buyer concerning this transaction, including any dispute or controversy with respect to the Deposit.

**17.00    Indemnification by Real Estate Buyer.**

Real Estate Buyer shall indemnify, save, protect, defend and hold harmless Seller, their employees, members, managers, shareholders, officers, directors and agents, from and against all claims, liabilities, losses, demands and causes of action of any nature whatsoever ("Losses") arising out of Real Estate Buyer's ownership of the Purchased Assets following the Closing. Real Estate Buyer further agrees to pay any reasonable attorneys fees and expenses of Seller arising from any indemnification obligation hereunder.

**17.01    Indemnification by Seller.**

Seller shall indemnify, save, protect, defend and hold harmless Real Estate Buyer, its employees, members, managers, shareholders, officers, directors and agents in accordance with terms and subject to the conditions set forth in the Asset Purchase Agreement.

**18.00    Entire Agreement; Binding Effect.**

This Agreement constitutes the entire agreement between the parties with respect to the transaction contemplated herein, and it supersedes all prior understandings or agreements between the parties. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, personal representatives, successors and permitted assigns.

**19.00    Survival of Paragraphs.**

The terms, conditions and warranties contained in Paragraphs 7.00, 10.00, 13.00, 17.00 and 17.01 herein shall survive the Closing and delivery of the deed of conveyance contemplated by this Agreement.

**20.00    Waiver; Modification.**

The failure by Real Estate Buyer or Seller to insist upon or enforce any of their rights shall not constitute a waiver thereof, and nothing shall constitute a waiver of Seller's or Real Estate Buyer's right to insist upon strict compliance with the terms of this Agreement. Either party may waive the benefit of any provision or condition for its benefit which is contained in this Agreement. No oral modification of this Agreement shall be binding upon the parties and any modification must be in writing and signed by the parties.

**21.00    Governing Law; Venue.**

This Agreement shall be governed by and construed under the laws of the State of Florida. The venue of any litigation arising out of this Agreement shall be the Bankruptcy Court.

**22.00    Headings.**

The paragraph headings as set forth in this Agreement are for convenience or reference only and shall not be deemed to vary the content of this Agreement or limit the provisions or scope of any paragraph herein.

**23.00    Notices.**

Any notice, request, demand, instruction or other communication to be given to either party, except where required by the terms of this Agreement to be delivered at the closing, shall

be in writing and shall be sent by registered or certified mail, return receipt requested, or by express overnight courier, or by email, as follows:

| | |
|---|---|
| If to Real Estate Buyer: | Hollywood Property Investments, LLC<br>Attn: Jack Michel, M.D., President & CEO<br>Administrative Offices5996 SW 70th Street.<br>5th Floor, South Miami, FL  33143 |
| with a copy to: | Kopelowitz Ostrow<br>Attn: Gary Matzner<br>2525 Ponce de Leon Blvd, Suite 625<br>Coral Gables, FL 33134<br>Matzner@KOlawyers.com |

      -AND-

| | |
|---|---|
| | Alan Perlman<br>Roetzel & Andress<br>350 Las Olas Boulevard<br>Las Olas Centre II Suite 1150<br>Fort Lauderdale, FL 33303-0310<br>Email:  Aperlman@ralaw.com |
| If to Seller: | High Ridge Management Corp.<br>2421 NE 32 CT<br>Lighthouse Point, FL 33064<br>Attn: Tamir Zury |
| with copy to | Perlman, Bajandas, Yevoli & Albright, P.L.<br>200 South Andrews Avenue, Ste. 600<br>Fort Lauderdale, Florida 33301<br>Attn: Mark Albright, Esq.<br>Fax: (954) 566-7115<br>Email: malbright@pbyalaw.com |

                                       -AND-

Markowitz Ringel Trusty Hartog, P.A.
Attn: Grace E. Robson
101 NE Third Avenue, Suite 1210
Fort Lauderdale, FL 33301
Fax:  954.767.0035
Email: GRobson@mrthlaw.com

***With a copy to***:

Genovese Joblove & Battista, P.A.
Attn: Paul J. Battista
100 S.E. Second Street, 44th Floor
Miami, FL 33131
Fax: (304) 349-2310
Email: pbattista@gjb-law.com

Notice shall be deemed given if forwarded by certified mail through the facilities of the United States Postal Office on the day following the date that the notice in question is deposited in the facilities of the U. S. Postal Service.  If notice is forwarded by express overnight courier, it shall

Purchase and Sale Agreement                    12

be deemed given on the day following the date that the notice in question is deposited in the facilities of an express overnight courier.

### 24.00   Assignment.

Seller shall not assign or transfer this Agreement or any of its rights or obligations incurred hereunder. Real Estate Buyer shall have the right prior to Closing to assign its rights to receive all or part of the Purchased Assets to one or more designees, provided that such assignment shall not relieve Real Estate Buyer of any of its obligations hereunder.

### 25.00   Attorneys' Fees.

In the event that it becomes necessary for either party to bring suit to enforce the terms of this Agreement, then the prevailing party shall be entitled to recover all costs, including attorneys' fees, incurred in connection with such litigation (including appellate proceedings) against the nonprevailing party.

### 26.00   Time of the Essence.

All time periods shall be measured in calendar days. Time is of the essence with respect to each provision of this Agreement which requires that action be taken by either party within a stated time period, or upon a specified date. Provided, however, if the date for performance is on a Saturday, Sunday or federal holiday, the date for performance shall be extended to the next business day.

### 27.00   Construction.

Each party hereto hereby acknowledges that all parties hereto participated equally in the drafting of this Agreement and that, accordingly, no court construing this Agreement shall construe it more stringently against one party than the other.

### 28.00   Section Headings.

The section headings as herein used are for convenience or reference only and shall not be deemed to vary the content of this Agreement or the covenants, agreements, representations and warranties herein set forth or limit the provision or scope of any section herein.

### 29.00   Counterparts; Electronic Signature.

To facilitate execution, this Agreement may be executed by electronic or facsimile signature, and in as many counterparts as may be required; and it shall not be necessary that the signature of, or on behalf of, each party, or that the signatures of all persons required to bind any party, appear on each counterpart; but it shall be sufficient that the signature of, or on behalf of, each party, or that the signature of the persons required to bind the party appear on one or more of such counterparts. All counterparts and electronic or facsimile signatures shall collectively constitute a single binding agreement.

### 30.00   Radon Gas.

The following disclosure is required to be furnished to Real Estate Buyer under Florida law:

> Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in building in Florida. Additional information regarding radon and radon testing may be obtained from your county public health center.

Purchase and Sale Agreement                    13

**31.00  <u>Further Assurances</u>.**  Each of Seller and Real Estate Buyer shall provide to the other such further assurances as may reasonably be required hereunder to effectuate the purposes of this Agreement and the transactions contemplated herein and, without limiting the foregoing, shall execute and deliver such affidavits, certificates and other instruments as may be provided for  necessary and/or appropriate in connection therewith.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year last below written.

**BUYER:**     Hollywood Property Investments, LLC

By:     _Jack J. Michel_

Name:     _Jack J. Michel_

Title:     _Managing Member_

Date:     _6/26/15_


**SELLER:**     High Ridge Management Corp.

By:     _____

Name:     _____

Title:     _____

Date:     _____


Hollywood Hills Rehabilitation Center, LLC

By:     _____

Name:     _____

Title:     _____

Date:     _____


The undersigned acknowledges and agrees to act as Escrow Agent in accordance with the terms of this Agreement.

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.


By:     _____


Signature Page to Purchase and Sale Agreement

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year last below written.

|  |  |
|---|---|
| **BUYER:** | Hollywood Property Investments, LLC |
| By: | _____ |
| Name: | _____ |
| Title: | _____ |
| Date: | _____ |

|  |  |
|---|---|
| **SELLER:** | High Ridge Management Corp. |
| By: | _____ |
| Name: | Tarin Zuru |
| Title: | Dir |
| Date: | 6-26-15 |

|  |  |
|---|---|
|  | Hollywood Hills Rehabilitation Center, LLC |
| By: | _____ |
| Name: | Tarin Zuru |
| Title: | Dir |
| Date: | 6-26-15 |

The undersigned acknowledges and agrees to act as Escrow Agent in accordance with the terms of this Agreement.

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.

By: _____

Mark Albright, for the Firm

Signature Page to Purchase and Sale Agreement

## EXHIBIT LIST

**EXHIBIT A** **<u>LEGAL DESCRIPTION OF THE PROPERTY</u>**
**EXHIBIT B** **<u>ALLOCATION OF THE PURCHASE PRICE</u>**
**EXHIBIT C** **<u>SPECIAL WARRANTY DEED</u>**
**EXHIBIT D** **<u>BILL OF SALE</u>**
**EXHIBIT E** **<u>GENERAL ASSIGNMENT</u>**

# EXHIBIT A

## <u>LEGAL DESCRIPTION OF THE PROPERTY</u>

**<u>PARCEL A:</u>**
Lots 1 through 12, Block 45, HOLLYWOOD HILLS, according to the Plat thereof, as recorded in Plat Book 6, Page 22 of the Public Records of Broward County, Florida.

TOGETHER WITH:

**<u>PARCEL B:</u>**
Lessee's interest under that certain lease by and between the City of Hollywood and High Ridge Management Corp., a Florida Corporation, for the following described property:
That portion of Garfield Street right-of-way lying south of and adjacent to Block 45 of Hollywood Hills, according to the Plat thereof, recorded in Plat Book 6, Page 22, of the Public Records of Broward County, Florida being more particularly described as follows:

> Said portion of Garfield Street bounded on the north by the south line of said Block 45, bounded on the south by a line 18.0 feet south of and parallel with the South line of said Block 45, bounded on the west by a line of 20.0 feet east of and parallel with the southerly extension of the west line of said Block 45 and bounded on the east by a line 79.0 feet west of and parallel with the southerly extension of the east line of said Block 45.

Exhibit A to Purchase and Sale Agreement

**EXHIBIT B**

**ALLOCATION OF THE PURCHASE PRICE**

|$17,500,000.00 allocated to High Ridge Management Corp. and the balance of the Purchase Price ($7,100,000.00) allocated to the Purchased Assets under the Asset Purchase Agreement